Nancy J. KOBRIN, Appellant,

v.

UNIVERSITY OF MINNESOTA; The Regents of the University of Minnesota, Appellees.

No. 93–2909.

United States Court of Appeals, Eighth Circuit.

Submitted May 9, 1994.

Decided Sept. 9, 1994.

Kay Nord Hunt, Minneapolis, MN, argued (Andrea F. Rubenstein, on the brief), for appellant.

Mark Benjamin Rotenberg, Minneapolis, MN, argued, for appellee.

Before MAGILL, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and BOGUE,* Senior District Judge.

MAGILL, Circuit Judge.

Nancy Kobrin (Kobrin) appeals from the district court's order granting the University of Minnesota (University) summary judgment on Kobrin's Title VII discriminatory treatment and retaliation claims. Kobrin argues that the district court erred in concluding that she failed to produce evidence creating genuine issues of material fact on either claim. We affirm in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND

Kobrin began the Ph.D. program in the University's Department of Comparative Literature (Department) in 1978. Her thesis topic centered on semiotic analysis related to medieval Iberian culture. She also received psychoanalytical training as an advanced research fellow at the Institute for Psychoanalysis in Chicago. Kobrin received her Ph.D. in 1984.

Prior to receiving her Ph.D., Kobrin was recruited to serve as Acting Program Director for the University's Center for Humanistic Studies (CHS), an interdisciplinary institute that the College of Liberal Arts (CLA) established to promote research in the humanities. After receiving her degree, she remained at CHS with a new title, Program Coordinator. To receive that position, she had to apply, interview, and be selected after a national search. Under a consent decree entered into by the University in the *Rajender*[1] case, the University must conduct a nationwide search to fill any academic, non-student position (*Rajender* search).

Kobrin served in a non-tenured, year-to-year position with CHS until 1988. While with CHS, she also taught courses in the Department. In 1988, however, CHS closed and Kobrin's position was eliminated. Around the same time, two Department faculty members resigned. On the recommendation of one of the departing professors, the Department hired Kobrin as a "lecturer." At the University, the term "lecturer" denotes a non-permanent, non-tenure track teaching position which can involve some administrative duties. Kobrin's lecturer position was funded by a CLA revolving fund of "soft money." Soft money is funds which are granted to a particular department for a particular purpose on an annual basis. Kobrin's last "Notice of Appointment" for the position stated that her job was to run from September 16, 1989 to June 15, 1990.

When the University changed Kobrin's title to lecturer, it informed her that the change triggered the need for a *Rajender* search. Kobrin objected to the need for a search on the ground that her new position was not substantively different from her CHS position. The deans of the CLA disagreed and concluded that a *Rajender* search was necessary because her new position was materially different than the old one. The University's Equal Opportunity Office granted the Department a one-year exemption from the search requirement because there was not enough time to conduct a search before the academic year began. The Equal Opportunity Office, however, made clear that Kobrin's position could not be continued without a search.

* THE HONORABLE ANDREW W. BOGUE, Senior United States District Judge for the District of South Dakota, sitting by designation.

1. In *Rajender v. University of Minnesota*, No. 4–73–435 (D.Minn. Aug. 13, 1980), women brought a class action sex discrimination suit against the University. The University entered into a consent decree as a result of the suit.

Meanwhile, in 1988, the CLA approved funding for two new faculty positions, one senior and one junior, in the Department. The Department formed a search committee consisting of three men and four women and advertised for a candidate with "a solid background in critical theory and at least one of the following areas: literature with an emergent critical interest; continental European literature of a period after 1600; media studies." Kobrin applied for the junior position. Out of about 100 applicants, the search committee narrowed the field to fourteen or fifteen semi-finalists, including Kobrin. The committee selected Prabhakara Jha, who had a strong background in literature with an emergent critical interest, for the junior position.

As to the senior position, the person that the committee selected rejected the job offer. Because it found no other suitable candidates, the committee received permission to hire an additional junior professor out of the original pool of candidates. After interviews with faculty members and evaluation of sample lectures to students and faculty, the Department selected Peter Canning to fill the second position. In July 1989, the chair of the search committee, Professor Ronald Sousa, sent Kobrin a letter advising her that the Department had selected Canning. The letter stated that Canning "works in areas of critical theory—especially psychoanalysis—and in French."

In late August 1989, soon after receiving the letter informing her that her position would terminate in June 1990, Kobrin filed a *Rajender* claim [2] alleging sex discrimination against the Department in its hiring of Canning for the second junior position.[3] In June 1990, after the Department failed to renew her lecturer position, she filed a second *Rajender* claim. This second claim alleged that she was terminated in retaliation for filing her first claim.

Pursuant to the *Rajender* consent decree, a Special Master considered Kobrin's claims. The Special Master recommended that the district court grant the University's motion for summary judgment on both claims. First, he rejected Kobrin's sex discrimination claim, finding that she had failed to make out a Title VII prima facie case under *McDonnell Douglas* and that she had failed to show that the University's proffered reason for hiring Canning was pretextual. He also rejected her retaliation claim, concluding that there was no causal connection between her termination and her filing of the first claim and that the University had legitimate, non-discriminatory reasons for terminating her. On appeal to the district court, Kobrin objected to the Special Master's recommendations. The district court, however, agreed with the Special Master's findings and granted the University summary judgment. Kobrin timely appealed.

## II. DISCUSSION

### A. Standard of Review

■ We review a district court's decision to grant summary judgment de novo. Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The non-moving party is entitled to the benefit of all favorable inferences.

### B. Failure to Hire Claim

Kobrin first argues that the district court erred in granting summary judgment to the University on her claim that the University violated Title VII by hiring Canning. She claims that there are factual disputes relating to the elements of her prima facie case and whether the University's articulated reasons for hiring Canning are pretextual.

■ In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases." *St. Mary's Honor Ctr. v. Hicks,* ——

---

2. Sex discrimination claims against the University are brought under the *Rajender* consent decree, but Title VII standards govern the claims.

3. Kobrin does not challenge the Department's decision to hire Jha, a male, for the other junior position.

U.S. ——, ——, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993). *McDonnell Douglas* announced a three-step process for analyzing such cases. First, the plaintiff must establish a "prima facie" case of discrimination. In sex discrimination cases, the plaintiff makes out a prima facie case by proving: (1) that she is a member of a protected class; (2) that she was qualified for the position for which the employer was accepting applications; (3) that she was denied the position; and (4) that the employer hired a man for the position. *See id.* at ——, 113 S.Ct. at 2747. Establishing a prima facie case creates a presumption that the employer unlawfully discriminated against the plaintiff.

██ Once the plaintiff establishes a prima facie case, the defendant then has the burden of production of articulating a legitimate, nondiscriminatory reason for its employment decision. *Id.* If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted and drops from the case. *Id.* The plaintiff then has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision and that sex was. *Id.* The plaintiff retains the ultimate burden of persuading the trier of fact that she was the victim of intentional discrimination. *Id.* at —— – ——, 113 S.Ct. at 2747–48.

The parties agree that Kobrin satisfies elements (1), (3), and (4) of the prima facie case. The district court found, however, that Kobrin had failed to create a genuine issue of fact as to element (2), i.e., whether she was qualified for the junior faculty position. The court found that although "Kobrin did in fact adduce some evidence that she is objectively qualified for th[e] position," she failed to create a fact issue as to whether "she is equally or more qualified than ... Canning." Dist.Ct.Order at 5 (June 17, 1993). The court focused on the Department's advertisement for the position, reasoning that Kobrin did not even argue that "her qualifications equalled or exceeded those of ... Canning in the relevant [academic] areas [specified in the advertisement]." *Id.*

██ We hold that the district court erred in its analysis of element (2) of the prima

facie case. "For purposes of establishing a prima facie case, the plaintiff[ ] need only show [her] *objective qualifications* for the job." *Legrand v. Trustees of the Univ. of Ark.,* 821 F.2d 478, 481 (8th Cir.1987) (citing *Lynn v. Regents of the Univ. of Cal.,* 656 F.2d 1337, 1344–45 (9th Cir.1981), *cert. denied,* 459 U.S. 823, 103 S.Ct. 53, 74 L.Ed.2d 59 (1982)) (emphasis added), *cert. denied,* 485 U.S. 1034, 108 S.Ct. 1592, 99 L.Ed.2d 907 (1988). Requiring Kobrin to show that she was more qualified than Canning at step one of the *McDonnell Douglas* framework "collapse[s] the three step analysis into a single initial step in which all issues [are] resolved." *Lynn,* 656 F.2d at 1344. Thus, whether Kobrin was more qualified than Canning is not relevant to her prima facie case.

██ Under *Legrand,* Kobrin produced sufficient evidence to create a genuine issue of material fact as to whether she was qualified for the position. Kobrin produced evidence that she had expertise in both critical theory and literature with an emergent critical interest. The district court recognized that Kobrin produced evidence that she was "objectively qualified" for the junior faculty position. Indeed, the Department itself essentially conceded that she was qualified: it made her one of fourteen or fifteen semifinalists for the first position out of about 100 applicants; and one of its professors wrote to her that "virtually all" of the applicants were "well qualified" and that she was among a "very small percentage [chosen] for close consideration." II Jt.App. at 357. Thus, at the very least, there is a factual dispute as to whether Kobrin was qualified for the position.

This case really revolves around the second and third steps of the *McDonnell Douglas* framework. In *Hicks,* the Court described steps two and three in detail. At step two, the employer must produce a legitimate, nondiscriminatory reason for its actions. If it does so, the presumption of discrimination created by the plaintiff's prima facie case "drops out of the picture." —— U.S. at ——, 113 S.Ct. at 2749. From that point on, the plaintiff may prevail if she shows that the employer's articulated reason

is a pretext for discrimination. "[R]ejection of the defendant's proffered reasons ... will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and ... upon such rejection, 'no additional proof of discrimination is *required*.'" *Id.* (citation omitted).

Here, the University's proffered reason for hiring Canning is that he was better qualified for the advertised position than Kobrin. The members of the search committee believed that Canning would best add the dimension in critical theory needed in the Department and that his background was "more applicable" to the Department's needs than Kobrin's. II Jt.App. at 309. Thus, Kobrin may overcome summary judgment by producing evidence that, if believed, would allow "a reasonable jury to reject the defendant's proffered reasons for its actions." *Gaworski v. ITT Commercial Fin. Corp.*, 17 F.3d 1104, 1109 (8th Cir.1994).

We believe that there is sufficient evidence to create a genuine issue of fact as to pretext here. The Department sought applicants with a solid background in critical theory and at least one of the following core areas: media studies, emergent literature, and continental European literature after 1600. The University suggests that Kobrin was objectively less qualified for the position than Canning because (1) the only core area in which she had expertise, emergent literature, had been filled when the Department hired Jha for the first junior position and (2) Canning had expertise in the other two core areas, which had not yet been filled.

There is evidence, however, that the Department was not concerned at all with the core areas when it was searching for a second professor. First, when comparing Kobrin's qualifications to Canning's in depositions, the University's witnesses focused on Canning's allegedly superior background in critical theory. Moreover, Sousa, the chair of the search committee, testified that the emphasis on the second position was on the critical theory area and that the search committee simply selected for interviews the semi-finalists from the search for the first position who were the strongest in critical theory. *See* II Jt.App. at 305–06. Thus,

there is evidence that the Department in practice disregarded the core areas in its search for a second professor. *See Cotton v. City of Alameda*, 812 F.2d 1245, 1249 (9th Cir.1987) (explaining that the issue is whether one candidate is more qualified than another with respect to the criteria that the employer actually uses). If a jury found that the Department ignored the core areas in the selection process, it could find pretextual the University's current claim that Kobrin was less qualified than Canning because Jha had already filled the emergent literature position.

Moreover, we believe that the University's explanations for hiring Canning instead of Kobrin have changed significantly over time. Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext. *See Briscoe v. Fred's Dollar Store, Inc.*, 24 F.3d 1026, 1028 (8th Cir.1994). Here, soon after it hired Canning, the Department wrote Kobrin a letter stating that Canning worked in "areas of critical theory— *especially psychoanalysis* —and in French." I Jt.App. at 196 (emphasis added). Thus, initially, the Department emphasized Canning's background in psychoanalysis as evidence of his expertise in critical theory. Now, however, the University argues that Canning was more qualified for the position because Kobrin's expertise in critical theory was too focused on psychoanalysis. In other words, the Department first claimed that it hired Canning primarily because of his expertise in psychoanalysis, but now asserts that Kobrin was not as qualified because her emphasis in critical theory was on psychoanalysis. Moreover, the University now asserts that Kobrin's expertise in psychoanalysis "was not one of the areas the Department was attempting to fill as a result of the search." Appellee's Br. at 21. In addition, Kobrin produced evidence that, when he began his job, the Department assigned Canning courses in psychoanalysis and literature that Kobrin had developed. Considering the evidence in the light most favorable to Kobrin, we hold that a reasonable jury could reject the University's proffered reasons for hiring Canning. *See Gaworski*, 17 F.3d at

1109. For this reason, we hold that the University is not entitled to summary judgment on Kobrin's sex discrimination claim. *See id.*[4]

## C. Retaliation Claim

Kobrin's second claim is that the University retaliated against her for filing the *Rajender* sex discrimination claim by terminating her lecturer position after the 1989/1990 academic year. She argues that the district court erred in finding that no genuine issue of material fact exists as to this claim.

■ To establish a prima facie case of retaliation under Title VII, a plaintiff must show: (1) that she engaged in protected activity; (2) that adverse employment action occurred; and (3) a causal connection between the two. *Jackson v. Missouri Pac. R.R.*, 803 F.2d 401, 406–07 (8th Cir.1986). If the employee establishes a prima facie case, the employer must then articulate a legitimate, nondiscriminatory reason for its actions. If the employer meets this burden of production, the employee has the burden of showing that the employer's proffered reason is pretextual and that sex was the real reason for the employer's action. *See Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir.1980), *cert. denied*, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981).

Here, Kobrin engaged in protected activity—filing her *Rajender* claim—and suffered adverse employment action—her lecturer position was terminated. There is no genuine fact issue, however, as to whether there was a causal connection between the termination of her lecturer position and her filing of a sex discrimination claim: before she filed her first *Rajender* claim, Kobrin received a letter from the chair of the Department informing her that "the position ... for 1989/1990 is for this academic year only and carries no promise of further employment." I Jt.App. at 203. Because the termination date of June 1990 was established before she filed her discrimination claim, Kobrin cannot show the causal connection element of the prima facie case as to the termination of her position.

Kobrin actually seems to be arguing that the University's *failure to renew* her position was retaliatory. We will assume for purposes of argument that failure to renew a position constitutes "adverse employment action" for purposes of a retaliation claim. *See Ruggles v. California Polytechnic State Univ.*, 797 F.2d 782, 785–86 (9th Cir.1986) (failure to hire can constitute adverse employment action in a retaliation claim). We will further assume that Kobrin established a causal connection between the Department's failure to renew her position and her filing of the original *Rajender* claim, i.e., that she proved that the decisionmakers in the Department were aware of her protected conduct, *see Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir.1982), and that the adverse employment action "followed the protected activity so closely in time as to justify an inference of retaliatory motive," *Rath v. Se-*

---

**4.** If the issue of Kobrin's and Canning's relative qualifications in comparative literature had arisen, we note that courts accord a high degree of deference to the judgment of university decisionmakers regarding candidates' qualifications for academic positions. *See Brousard–Norcross v. Augustana College Ass'n*, 935 F.2d 974, 976 (8th Cir.1991) (upholding summary judgment for college in sex discrimination suit and explaining that court "will not sit as a 'super personnel council' to review tenure decisions"); *Brown v. Trustees of Boston Univ.*, 891 F.2d 337, 346 (1st Cir.1989) ("A court may not simply substitute its own views concerning the plaintiff's qualifications for those of the properly instituted authorities[.]"), *cert. denied*, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). To prevail, the plaintiff must show something more than a mere dispute over her qualifications for the position. *See Molthan v. Temple Univ.*, 778 F.2d 955, 962 (3d Cir.1985). Indeed, in the tenure context, for example, the plaintiff's evidence of pretext " 'must be of such strength and quality as to permit a reasonable finding that the denial of tenure was 'obviously' ... unsupported.' " *Villanueva v. Wellesley College*, 930 F.2d 124, 129 (1st Cir.) (citations omitted), *cert. denied*, —— U.S. ——, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991); *cf. Odom v. Frank*, 3 F.3d 839, 847 (5th Cir.1993) (explaining that "unless disparities in curricula vitae are so apparent as virtually to jump off the page and slap us in the face, we judges should be reluctant to substitute our views for those of the individuals charged with the evaluation duty") (high level post office position).

Our holding here does not implicate these concerns because it is based on issues unrelated to the Department's evaluation of Canning's and Kobrin's academic qualifications.

*lection Research, Inc.,* 978 F.2d 1087, 1090 (8th Cir.1992).

 To analyze steps two and three of the retaliation inquiry, we must first discuss Kobrin's position in more detail. Her position was funded by a CLA revolving fund of soft money. The CLA, at its discretion, disburses these funds on an annual basis to particular departments for particular purposes; soft money has to be negotiated on an annual basis. Kobrin does not dispute that her position depended on the Department's receipt of soft funds. Moreover, pursuant to the *Rajender* consent decree, the University must conduct a nationwide search before filling academic positions. Equal opportunity administrators allowed the Department to hire Kobrin in 1989/1990 without such a search, but said that searches had to be conducted for any future appointments as to her position.

The University offers legitimate, nondiscriminatory reasons for failing to renew Kobrin's position: there were no soft funds available for her position and a *Rajender* search had to be conducted to maintain the position. Professor Jochen Schulte–Sasse testified that it was impossible to conduct a search for the position because of the way that the CLA operated. He testified that searches for lecturer positions like Kobrin's have to be conducted before June because otherwise applicants are not available. II Jt.App. at 400. The CLA, however, never authorizes funds for such positions prior to mid-July of each year, when the budget is finalized. Therefore, the only way that the Department may hire people for such positions is to secure search exemptions. Here, however, administrators refused to grant any further exemptions for Kobrin.[5]

Kobrin first argues that the University's proffered reasons are pretextual because the Department never sought funds to continue her position. In light of Schulte–Sasse's unrefuted testimony, however, formally requesting funds for the position would have been futile. Kobrin also claims that the Department hired a male visiting professor with soft funds from the CLA. This assertion is similarly deficient: she has no evidence that the male professor was, like her, ineligible for a search exemption. For these reasons, we hold that Kobrin has failed to create a genuine issue of material fact as to pretext on her retaliation claim.[6]

### III. CONCLUSION

For the foregoing reasons, we reverse the judgment of the district court as to Kobrin's failure to hire claim, affirm as to her retaliation claim, and remand for further proceedings.

**5.** The Department requested, and the Equal Opportunity Office granted, a search exemption for Kobrin's position before she filed her *Rajender* claim. Thus, to the extent she asserts that the Department sought a search exemption in retaliation for her claim, we reject such an argument.

**6.** Kobrin also argues that there is evidence that all of the following occurred after she filed her original *Rajender* claim: she was terminated at an abusive and demeaning faculty meeting, the head of the Department stopped speaking to her, the Department forced her to share her office with another professor, and the Department falsely accused her of traveling to conduct research without permission. Kobrin, however, does not argue a separate "discriminatory work environment" claim. Thus, we do not see the relevance of this evidence to her retaliatory termination claim. *See Williams v. KETV Television, Inc.,* 26 F.3d 1439, 1444 (8th Cir.1994).