**Anne S. TATE, Plaintiff,**

v.

**INSITUFORM MID–AMERICA, INC. and Insituform Texark, Inc., Defendants.**

No. LR–C–92–535.

United States District Court,
E.D. Arkansas,
Western Division.

Oct. 20, 1994.

---

John T. Lavey, Little Rock, AR, for plaintiff.

Michael S. Moore, Friday, Eldredge & Clark, Little Rock, AR, for defendants.

### ORDER

ROY, District Judge.

Plaintiff Anne S. Tate has brought this employment related sex discrimination case against her former employer(s) pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Equal Pay Act, 29 U.S.C. § 206(d). In her complaint, plaintiff alleges that she was discriminated against by the defendants in that she was denied pay and other benefits equal to that given similarly situated male employees and, ultimately, was unlawfully terminated on account of her sex. She properly first sought and obtained a notice of right to sue letter from the Equal Employment Opportunity Commission.

Because plaintiff's Title VII claim predated the new Civil Rights Act which provides for a jury trial of such claims, the trial of her case was bifurcated. The issues arising under the Equal Pay Act, those concerning the amount of her pay and other benefits, were heard and decided by a jury in favor of the plaintiff, resulting in a verdict in her favor in the amount of $9,100.00. The Title VII claim chiefly addresses her termination, although there is some overlap between the two claims regarding compensation.

The Title VII claim was heard by the Court and was taken under advisement pending the submission of post-trial briefs by the parties. In this opinion the Court will address the matter of liquidated damages regarding the Equal Pay Act claim, along with the issues relevant to the Title VII claim. What follows are the Court's findings of fact and conclusions of law.

I.

Ms. Anne Tate went to work for defendant Insituform Texark, Inc. ("Texark") on or about August 26, 1990 as a marketing and sales representative. Texark is a subsidiary of defendant Insituform Mid–America, Inc., ("IMA"). IMA has a license from Insituform North America for the so called "Insituform

process," a method of rehabilitating damaged or deteriorating pipeline systems without having to excavate the existing pipeline. Subsidiary Texark, during the time of plaintiff's employ, operated in Arkansas and Texas. Both defendants are employers within the meaning of 42 U.S.C. § 2000e–5(b).

On January 1, 1989, Texark hired Mr. Don Yonts, who lived in Plano, Texas, as salesman for the Arkansas sales territory. During his tenure in that position, Mr. Yonts' sales results did not meet with the company's expectations. Furthermore, he never followed through on his assurance to relocate to Little Rock, the Texark headquarters. Consequently, he was reassigned to a position in Dallas.

Ms. Tate was hired in August, 1990 to replace Mr. Yonts. When selected for the position, she was not employed and was living in Louisiana with her husband, a member of the Louisiana State Police. At that time, there was only one other female sales rep working for IMA and its subsidiaries, Ms. Jennifer Erickson.

When Yonts had been hired, he was given a base salary of $38,000 per year, plus commissions. However, the defendants guaranteed he would receive first year commissions (through 6–30–90) of $12,000, thereby making his first year guaranteed salary $50,000. Furthermore, defendants agreed to pay Mr. Yonts' transportation expenses between Little Rock and Plano, "temporary" housing and living expenses (he maintained an apartment in Little Rock), out of pocket moving expenses, and an *additional* moving allowance of $10,000 to cover all other "incidental expenses associated with relocation."

In contrast, on Mr. Yonts' hire date, Ms. Erickson was receiving an annual salary of only $33,280, despite having been with the company for about 4½ years and despite having received outstanding job evaluations.

When Mrs. Tate was hired following Mr. Yonts' reassignment for poor performance, she was only given an annual salary of $35,000 plus commissions, and did not get any guaranteed commissions as Mr. Yonts had. Furthermore, her request to be paid moving expenses from Monroe, Louisiana was rejected by Mr. Mark Slack, defendants' regional sales manager.[1]

Also, from the time she was hired in August 1990, until her husband relocated to Little Rock on May 1, 1991, the plaintiff paid $350 per month in rent, plus other expenses attendant to living away from home. However, Tate's request to have her housing, living, and transportation expenses paid by the defendants, a request made after she found out that Yonts had received these expenses, was denied by Slack.

During the nine months after her hire, the plaintiff worked to establish contacts and otherwise cultivate her sales territory and make sales. She frequently received compliments on her work from her superiors and never was given a bad evaluation during that period.

For example, in late March 1991, Mrs. Tate and other IMA sales reps attended a sales meeting in Dallas during which the new sales manager, Bill Reed, was introduced. Also in attendance were Slack (the outgoing sales manager), Reed, and Jim Scott, IMA's vice-president in charge of sales and marketing. At the meeting, Scott made very favorable reference to a marketing plan Tate had drafted at Slack's direction, and urged the other sales reps to read the plan. Scott also told those present that Mrs. Tate would have a long career with the company because of the great job she was doing in Arkansas.

In May of 1991 her husband joined her in Little Rock. She had been continually assured she was doing a good job and had a bright future with the company. However, on May 19, 1991, Mr. David Smith contacted Yonts and informed him that he was no longer working at U–Line, one of the defendants' competitors, and was interested in working for the defendants. The following day, Yonts relayed this information to Reed, the new sales manager. Reed then informed Scott of this information the same day.

1. Because Mr. Yonts never moved to Little Rock, the defendants never actually had to pay his moving expenses, yet they would have been obligated to under their employment agreement with Yonts.

Two days later, May 22, 1991, Reed and Mrs. Tate attended a training seminar in Memphis. There, Reed was asked by an executive of Insituform of North America how business was developing in Mrs. Tate's territory. Reed responded that Mrs. Tate was going to be a rich woman because of the level of business in her territory.

The following day, Scott confided in Reed that he had been discussing employment with Smith. In a few days Scott told Reed to prepare two letters: one to be sent to Mrs. Tate, with the other to go to Scott.

The Memorandum to Mrs. Tate stressed the company's desire to "expan[d] our routine [sales] activities throughout ... Arkansas," which would necessitate an increase of travel and a refinement of skills on her part. The memo also specifically identified certain actions she was to take regarding specific potential accounts.

The only implicit criticism of the plaintiff in this memo was this statement: "To effectively cultivate consulting engineers, will require some refinement of your technical and consultive sales skills." She was encouraged to "call on anyone within the Company" sales skills when they join the Company: "IMA is a company that requires professional skills, we are not equipped for extensive formalized training and do not presently require this ability." Attached to the memorandum was a "Performance Appraisal" of Mrs. Tate, which contained some negative evaluations.

On June 1, 1991, Scott hired David Smith, despite the fact that Smith had no sales experience whatsoever. Because of his lack of sales experience, Smith had to be trained by the Company. This is ironic action indeed for a firm "not equipped for extensive formalized training."

On the morning of June 4, Mrs. Tate received Reed's fax of the May 28 memo. She then called Reed and asked to discuss the memo with him. Reed told Mrs. Tate that he and Scott were going to be in Little Rock the next day to meet with officials at Little Rock Waste Water and that they would meet with her in her office that day.

On June 5, 1991, without prior warning and after receiving no negative job evaluations prior to the fax received the day before, Mrs. Tate was fired.

## II.

### A. Equal Pay Act

■ Because the jury found that defendants violated the Equal Pay Act and awarded Ms. Tate damages in the amount of $9,100.00, it is within this Court's discretion to award her liquidated damages of up to 100% of that amount unless "the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation." *McKee v. Bi–State Development Agency*, 801 F.2d 1014, 1019 (8th Cir.1986) (citing 29 U.S.C. § 260).

■ It is this Court's finding that plaintiff has shown with clear and convincing evidence that the defendants intentionally paid Ms. Tate less base salary than males with similar duties because she was female. The Court therefore will award the plaintiff $9,100.00 in liquidated damages.

### B. Title VII claim

Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 provides in relevant part:

"It shall be an unlawful employment practice for an employer—

(1) ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ..."

42 U.S.C. § 2000e–2(a).

An allocation of the burden of production and an order for the presentation of proof in Title VII discrimination cases was established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–06, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). "The plaintiff in such a case ... must first establish, by a preponderance of the evidence, a 'prima facie' case of racial discrimination." *St. Mary's Honor Center v. Hicks*, —— U.S. ——, —————, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993).

■ Once accomplished, the defendant then has "the burden of producing an explanation to rebut the prima facie case—*i.e.,* the burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.' " *Id.* at ——, 113 S.Ct., at 2747 (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)).

■ If the defendant is successful, the plaintiff then has the " 'ultimate burden of persuading the trier of fact' " " 'that the proffered reason was not the true reason for the employment decision' and that [sex] was." —— U.S., at ——, 113 S.Ct., at 2747 (quoting *Burdine,* 450 U.S., at 256, 101 S.Ct., at 1095).

### 1. *Plaintiff's prima facie case.*

■ The Court first considers whether the plaintiff in this case, Ms. Tate, has met her initial burden of establishing a *prima facie* case. To make out a *prima facie* claim of disparate treatment in a gender/discharge case, a plaintiff must show:

(a) that she is a member of a protected class—female; (b) that she performed her job duties well enough to meet the legitimate expectations of her employer; (c) that, despite her qualifications, she was discharged; and (d) that, after her discharge, a man was hired to replace her.

*See, Hicks, Id.,* (race/discharge); *Kobrin v. University of Minnesota,* 34 F.3d 698, 702 (8th Cir.1994) (gender/failure to hire); 65 F.E.P.C. 1624.

Of course, there is no dispute that the plaintiff is a woman and that she was discharged, thus satisfying the first and third elements. Also, it is not disputed that a man, Mr. David Smith, was hired to replace the plaintiff, thus satisfying the fourth element. Thus, the Court will consider whether the plaintiff performed her job duties well enough to meet the legitimate expectations of her employer.

■ The Court finds that the plaintiff clearly established that her job performance met her employer's reasonable expectations. The Court cites the following evidence:

Mark Slack's (plaintiff's regional sales manager) compliments to Tate for a marketing plan she drafted and submitted to him in December of 1990, at his request. (2) The two notes Slack wrote to Tate in February, 1991, and his telephone conversations with her in February, 1991, informing her that she was doing a very good job for the defendants, in the context of her husband's decision whether to resign from the Louisiana State Police, which would be based in part on how well Mrs. Tate was doing with the company. (3) Scott's comments at the March, 1991, sales meeting in Dallas when he told the other sales representatives in attendance that they should read Tate's marketing plan, and that Tate would have a long career with defendants because of the great job she was doing for the Company in Arkansas; (4) Reed's statement at the May training seminar in Memphis, in response to a question about how business was in Tate's territory, that Tate was going to be a rich woman, because she had so much business going on in her territory; (5) Reed's testimony that Tate had a number of very good contracts that were going to be concluded in the imminent future; and (6) Reed's May 28, 1991, memorandum to Tate in which he complimented Tate for helping to identify the magnitude of the companies' business opportunities and for working to find ways to push projects from concept to opportunity and thanking her for her many constructive observations.

Therefore, the Court concludes that the plaintiff has made her *prima facie* case of sexual discrimination.

### 2. *Defendant's rebuttal.*

Since the plaintiff has made her *prima facie* case, the defendant now has the burden of "producing evidence" that the adverse employment actions were taken:

"for a legitimate, nondiscriminatory reason." *Burdine,* 450 U.S., at 254 [101 S.Ct., at 1094]. "[T]he defendant must clearly set forth, through the introduction of admissible evidence," reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimina-

944

tion was not the cause of the employment action.

*St. Mary's Honor Center v. Hicks,* —— U.S., at ——, 113 S.Ct., at 2747, quoting *Burdine,* 450 U.S., at 254–55, and n. 8, 101 S.Ct., at 1094, and n. 8 (emphasis added).

The chief reason articulated by the defendants is that Ms. Tate's replacement, Mr. David Smith, because of his training and work experience, was quite simply much better suited for the job than Ms. Tate. The evidence revealed that Mr. Smith is a registered engineer who at the time of his hiring, had just resigned his partnership position with one of Insituform's competitors.

Furthermore, prior to Mr. Smith's association with the competitor, he had served for five years as the Director of Engineering Services for the Little Rock Waste Water Utility. While in the latter position, he frequently was contacted by similarly positioned persons in other, smaller towns for advice because of his purported knowledge of new and developing technologies relating to the rehabilitation of sewer lines.

■ Defendants argue that Smith's qualifications were so clearly superior to the plaintiff's that they were justified in hiring him and firing Ms. Tate. The Court finds that the defendants have articulated a nondiscriminatory reason for firing the plaintiff, *which if believed by the trier of fact,* would be permissible.

### 3. *Plaintiff's ultimate burden.*

■ The Court having found that the defendants have sustained their burden of production by introducing evidence of a legitimate, nondiscriminatory reason for firing the plaintiff:

"the presumption raised by the prima facie case is rebutted," and "drops from the case." The plaintiff then has "the full and fair opportunity to demonstrate," through presentation of his own case and through cross-examination of the defendant's witnesses, "that the proffered reason was not the true reason for the employment decision," *and that [sex] was.* He retains that "ultimate burden of persuading the [trier

of fact] that [he] has been the victim of intentional discrimination."

*St. Mary's Honor Center v. Hicks,* —— U.S., at —— – ——, 113 S.Ct., at 2747–48 (emphasis added), quoting *Burdine,* 450 U.S., at 255, at 255, n. 10, and at 256, 101 S.Ct., at 1094, at 1095, n. 10, and at 1095.[2] In a case decided after *Hicks,* the Eighth Circuit put it more simply: "the three-part analysis [now] drops from the case, and the district court must only decide whether the employer intentionally discriminated ... against the employee." *Maness v. Star–Kist Foods,* 7 F.3d 704, 707 (8th Cir.1993).

■ The plaintiff argues that the defendants' proffered reasons are pretextual and that she was terminated because defendants wanted a man in that position. A finding that the defendants' proffered reasons are pretextual "will *permit* the trier of fact to infer the ultimate fact of intentional discrimination," but it does not *require* such a finding. *Hicks,* —— U.S., at ——, 113 S.Ct., at 2749 (emphasis in original). The pretext found must be for *discrimination.* "[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Id.,* —— U.S., at ——, 113 S.Ct., at 2752 (quoting *Burdine* ) (emphasis in *Hicks* opinion).

■ The Court finds that the plaintiff has successfully proven her claim in both respects. The following findings support the Court's holding:

1) The plaintiff's male predecessor, Don Yonts, was hired at a substantially higher salary than what the plaintiff was, and for that matter, at a much higher salary than what the company's only remaining female employee (Ms. Erickson) was earning, a woman with much experience and many good evaluations;

2) When Yonts' performance was deemed unsatisfactory, he was merely reassigned to the Dallas area by IMA's vice-president in charge of sales and marketing, Jim Scott. However, when plaintiff's sales were ad-

---

**2.** *Hicks* was a race discrimination case, but the     analysis is the same.

judged to be unsatisfactory, she was terminated;

3) Another salesman, Mr. Ernest Umble, was fired for poor performance, yet, unlike the plaintiff, was rehired by defendants in October of 1991;

4) When a man was hired to replace the plaintiff,[3] he was hired at the base salary of $55,000, with the right to "draw" $900 per week against future commissions, compared to Mrs. Tate's base salary of $35,000 with no right to receive draws.

5) Though the Company attributed the plaintiff's lack of production to poor sales skills, it did nothing to improve those skills, supposedly because it lacked the resources to provide extensive training to "would be" salespeople lacking in experience. However, the man hired to replace her had no sales experience whatsoever, yet was provided training and other support.

The Court concludes that the plaintiff was not treated as well as male salespeople, that the explanations offered by the defendants are pretextual, and that she was discharged because the Company desired to put a man in that position, which in fact it did. The plaintiff has proven her case under Title VII.

## III.

By way of remedy, plaintiff urges the Court to base her backpay calculations, not on her salary of $35,000, but rather on the salary of the person who replaced her ($55,000 in his first year). The Court is more inclined to base that calculation on *her* actual salary, given that it was much more in line with what other salespeople were earning, rather than on what Mr. Smith earned. However, the Court is willing to allow the parties to submit supplemental briefs on that issue, as well as the appropriateness of awarding reinstatement instead of frontpay, together with any other remedial issue the parties deem pertinent. The parties should also attempt to stipulate on attorney's fees and costs and submit that to the Court.

The plaintiff shall submit her brief no later than Monday, October 31, 1994, with the

defendants' reply brief due no later than Thursday, November 10, 1994.

IT IS SO ORDERED.

---

**3.** The Court is quite aware that Smith was hired four days before Mrs. Tate was discharged, but finds that the decision to replace Tate with Smith was made before Smith was hired.