# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1704

_____

| | | |
|---|---|---|
| Carol M. Lawrence, | * | |
| | * | |
| Appellant, | * | Appeal from the United States |
| | * | District Court for the Western |
| v. | * | District of Missouri. |
| | * | |
| Curators of the University of Missouri, | * | [PUBLISHED] |
| | * | |
| Appellee. | * | |

_____

Submitted: November 17, 1999

Filed: February 18, 2000

_____

Before McMILLIAN, FAGG, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

PER CURIAM.

Carol M. Lawrence appeals the district court's grant of summary judgment to the Curators of the University of Missouri (Curators) on Lawrence's sex discrimination claim. Having reviewed the record, we conclude Lawrence is not entitled to relief. We agree with the district court's analysis that there is no substantial evidence in the record tending to show the Curators' decision for denying Lawrence's application for promotion and tenure was a pretext for sex discrimination. We thus conclude the district court correctly granted summary judgment, and we affirm for the reasons stated in its ruling without further discussion. See 8th Cir. R. 47B.

McMILLIAN, Circuit Judge, dissenting.

I respectfully dissent.

Carol Lawrence became a "tenure-track" professor on the faculty of the University of Missouri (the University), College of Business and Public Administration (Business College), School of Accountancy, in January of 1988. The pertinent written guidelines regarding promotion and tenure state, among other things:

> 2. Quality Research. Good teaching is a necessary but not sufficient criterion; quality research is also expected of all faculty in the College. The most convincing evidence of quality research is publication of research results in refereed journals of high quality.

> . . . .

> The specific criteria to be used, the relative weighting to be made, and the procedures to be followed shall be clearly established by the appropriate administrative unit prior to evaluations and recommendations. All relevant information shall be explicitly communicated to the faculty members and each unit's criteria and procedures shall be consistent with the College guidelines.

Appellant's Appendix at 225-26.

Consistent with these guidelines, Lawrence received her first written evaluation from the School of Accountancy Promotion and Tenure Committee in 1989, after one year on the tenure track. That evaluation stated, among other things:

> The Committee strongly recommends that you develop on ongoing 'inventory' of four or five active research projects. That will help assure that you will ultimately accumulate at least five or six publications in

reputable journals (the apparent minimum research requirement today) by the time you come up for promotion and tenure.

Id. at 241.

The written evaluation she received in 1990 stated in part:

> In the research area, the article that you have forthcoming in Research in Governmental and Nonprofit Accounting [(RIGNA)] represents a good "hit," and the four research projects in process indicate good progress in developing the ongoing "inventory" of research studies we recommended last year.
>
> . . . .
>
> Overall, the Committee believes you are coming along fine and encourages you to keep up the good work.

Id. at 243.

However, the written evaluation she received in 1992, stated, among other things:

> Overall, your performance to date is viewed quite positively. You exhibit quality work in virtually everything you do and the Committee is aware of the extensive effort you are already devoting to your research program. However, as indicated, increasing concern is developing regarding the quantity of your research output.

Id. at 244 (emphasis in text). In response, Lawrence accelerated her research publication efforts and published three more papers in 1994. At the time her application for promotion and tenure was considered in the fall of 1994, she had three additional papers accepted for future publication, for a total of seven articles published or accepted for future publication.

The School of Accountancy Promotion and Tenure Committee was the first to vote on her application. The committee members voted 4-3 against promotion and tenure.[1] The next committee to review her application was the Business College's Promotion and Tenure Committee. That committee voted 5-0 against her application. Both the School of Accountancy promotion and tenure committee and the Business College promotion and tenure committee were chaired by Professor Earl Wilson. Professor Wilson explained the adverse recommendations as based upon Lawrence's record of publications – not because she published too few articles but, rather, because the research journals in which she published purportedly lacked quality. See id. at 266 (letter from Earl Wilson to Raymond Dockweiler, dated Nov. 1, 1994). This view was then adopted by the Director of the School of Accountancy, Raymond Dockweiler, who wrote: "[q]uite simply, she has not yet published in a top-tier research journal," id. at 264 (letter dated Nov. 3, 1994), and by the Dean of the Business College, Bruce Walker, who wrote: "[i]t would be heartening if one or more of her articles were published in a journal clearly recognized as one of the very best in the accountancy field." Id. at 253 (letter dated Dec. 2, 1994).

When Lawrence's application was reviewed by the Campus Promotion and Tenure Advisory Committee, they voted 6-2 in favor of promotion and tenure. The majority concluded that the negative votes Lawrence received at the departmental and divisional levels were unjustified and, moreover, that the outside reviews were, overall, "very positive." Id. at 251 (Memo from Charlotte Parker, Chair of the Campus Promotion and Tenure Advisory Committee, to Chancellor Charles Kiesler). Notwithstanding that committee's recommendation, as well as the concerns expressed in writing by Deputy Chancellor Brady Deaton, see id. at 544-47, both the Provost of

---

[1] Needless to say, the recommendation of this committee, composed of the front-line reviewers and Lawrence's closest academic peers, was critical to the success of her tenure application.

the University, Edward Sheridan, and the Chancellor of the University, Charles Kiesler, decided to deny Lawrence promotion and tenure.

As the district court recognized in the present case, the crux of this case is whether or not the Curators' proffered reasons for rejecting her tenure application represent a pretext for gender-based discrimination.  See Lawrence v. The Curators of the University of Missouri, No. 97-4109-CV-C-9, slip op. at 14-15 (W. D. Mo. Jan. 28, 1999).  I also agree with the district court's observation that, "[i]n evaluating the issue of pretext in cases involving the denial of tenure, 'courts must take special care to preserve the University's autonomy in making *lawful* tenure decisions.'"  Id. at 15 (emphasis added) (quoting Brown v. Trustees of Boston University, 891 F.2d 337, 346 (1st Cir. 1989) (Brown) (appeal after trial on the merits).  It is axiomatic, however, that, a denial of tenure motivated by gender-based discrimination is not a lawful decision. Furthermore, though "[a] court 'may not simply substitute its own views concerning the plaintiff's qualifications for those of the properly instituted authorities,'" id. (quoting Brown, 891 F.2d at 346), nor may the court substitute its own views about the weight and credibility of the evidence for those of the jury when there is a genuine issue of material fact.  In the present case, if Lawrence presented enough evidence that a reasonable jury *could* have made a finding that gender was a motivating factor, summary judgment was improperly granted.  See Brousard-Norcross v. Augustana College Ass'n, 935 F.2d 974, 976 (8th Cir. 1991) ("Summary judgment is to be granted only when there is no genuine issue as to any material fact.  Thus, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' summary judgment is not appropriate.") (internal citations omitted).

The Curators have proffered the following explanation for the decision to deny Lawrence tenure:

> Lawrence received negative recommendations for promotion in six
> out of seven levels of review by the University, and her weak research

record was cited as the principal reason. The undisputed material facts show that Lawrence did not publish in any top-tier journals, that her publications were all co-authored except for one article arising from her dissertation, and that four of the six outside reviewers who examined her research expressed criticism of her publication record.

Brief for Appellees at 21.

In response to this justification, Lawrence presented evidence and arguments to discredit each of the reasons given by the Curators for the denial of her tenure application. As I have stated, her burden at the summary judgment stage was not to prove her case, but to show the existence of a genuine issue of material fact. In my opinion, her affirmative evidence of pretext has established an issue of fact as to whether gender played a role in her peers' *subjective* evaluation of her tenure application. See id. at 3 (the tenure decision "necessarily entails judgment of quality which is subjectively made by the applicants' peers").

In response to the Curators' assertion that "[t]he undisputed material facts show that Lawrence did not publish in any top-tier journals," Lawrence introduced evidence suggesting that the standards for what constitutes a "top-tier" journal changed over time and, moreover, were applied unequally to her as compared with male candidates. For example, in 1992, the Director of the School of Accountancy, Raymond Dockweiler, wrote a letter to the Dean of the Business School, Bruce Walker, supporting a male tenure applicant, Robin Roberts, and stating in connection with Roberts's publications in RIGNA (in which Roberts had published two co-authored articles, see Appellant's Appendix at 502-03): "Since RIGNA is a publication of the American Accounting Association (AAA) and is the leading outlet for research in the area of governmental and nonprofit accounting, a growing number of accounting academics view it as a prestigious journal." Appellant's Appendix at 498. By contrast, when recommending to Dean Walker that Lawrence be denied tenure, Dockweiler wrote in 1994 – *notwithstanding Lawrence's publication of a sole-authored article in RIGNA* – that her

-6-

"lone problem area has been in the area of research. Quite simply she has not yet published in a top-tier research journal." Id. at 264.

Similarly, when Dean Walker wrote a letter to the Provost in 1992 supporting Roberts's tenure application, he favorably described RIGNA as "among the top dozen or so research journals in the accounting field." Id. at 491-92. By contrast, in recommending that Lawrence not be granted tenure, Dean Walker wrote in 1994 that the quality of her research fell short – notwithstanding her publication in RIGNA – because she had not published a single article in "a journal clearly recognized as one of the very best in the accountancy field." Id. at 253. In other words, while Dockweiler and Walker praised Roberts for publishing in RIGNA, they all but criticized Lawrence for publishing in the very same journal.[2]

Moreover, a review of the evaluations Lawrence received during her years on the tenure track support the conclusions that she was led to believe, and reasonably did believe, that research journals such as RIGNA were precisely the type of journals the department deemed worthy of tenure track publications. See id. at 243 (1990 written evaluation from School of Accountancy Promotion and Tenure Committee) ("the article that you have forthcoming in Research in Governmental and Nonprofit Accounting represents a good 'hit'"). In other words, the evidence suggests that Lawrence met the

---

[2]Dean Walker justified his treatment of RIGNA as a "second-tier" journal on the basis that it received an "A" rating, as opposed to the "A+" ratings received by seven other journals, according to a rankings list, see Appellant's Appendix at 324, produced by the School of Accountancy (but not formally approved by the School of Accountancy's faculty). See id. at 253 ("the School of Accountancy's ranking of journals not only was never approved by the faculty but also included an 'A+' category of journals, which to me reduced 'A' journals (such as Research in Governmental and Nonprofit Accounting[)] to second-tier status"). I believe, however, the pretextual nature of this explanation is a matter of genuine dispute if the same treatment was not applied for male tenure applicants and, moreover, if Lawrence was affirmatively led to believe that RIGNA was considered to be a sufficiently high-ranking journal.

expectations which were presented to her, and she only fell short when the critical decision makers *changed* the standards as they applied to her. Indeed, Deputy Chancellor Deaton, upon reviewing Lawrence's application for promotion and tenure, described this phenomenon as follows.

> She was led to believe that five or six journals articles would be acceptable . . . . [S]he was also assured that nationally recognized peer reviewed journals in her subfields would be acceptable. There is now argument over what constitutes quality journals in this area.
>
> The quality of her work was praised in annual reviews by the departmental [Promotion and Tenure] Committee on a consistent basis. She was urged to generate more quantity of articles which she did in her last couple of years and was then criticized for the lumpy nature of her output.

Joint Appendix at 544-45.

In my opinion, the apparent eleventh-hour changes in the standards that were applied to Lawrence – in addition to the evidence of unequal treatment – raise serious doubts about the sincerity of the Curators' first proffered justification for rejecting of Lawrence's tenure application, and warrant letting this case go to trial. See, e.g., Kobrin v. University of Minnesota, 34 F.3d 698, 702 (8th Cir. 1994) ("Substantial changes over time in the employer's proffered reasons for its employment decision support a finding of pretext.").

Lawrence has also responded to the Curators' assertion that she was denied tenure in part because her publications "were all co-authored except for one article arising from her dissertation." Again, she introduced evidence indicating that she was treated differently from male tenure candidates on this matter. For example, Robin Roberts had also co-authored all but one of his publications at the time his tenure application was being reviewed. With respect to Roberts, Dean Walker wrote:

-8-

In deciding whether to recommend that an assistant professor be promoted and tenured, I consider whether the candidate has established self-sufficiency in the research area. In my judgment, Professor Roberts passes this test. First, he has published a sole-authored article in one of the lead journals in the field. . . . Second, he has been the lead author on all but one of his co-authored pieces. Third, he has demonstrated the ability to work with a variety of co-authors, ranging from MU PhD students to faculty members at other institutions.

Appellant's Appendix at 492.

By contrast, with respect to Lawrence, Dean Walker wrote: "It would be desirable if she had demonstrated her self-sufficiency in the research area by having some sole-authored articles, but only the article based on her dissertation falls into that category." Id. at 253.

The Curators also justify the tenure decision on the basis that, according to "[t]he undisputed material facts . . ., four of the six outside reviewers who examined [Lawrence's] research expressed criticism of her publication record." In my view, the interpretation and weight to be given the comments made by the outside reviewers are matters within the sound discretion of the University in a proper tenure review process. In this case, however, even assuming that four of the six outside reviewers were "critical" of her research, their purported criticisms are confined to the following issues: the number of her publications, the quality of the journals in which she had published, and the number of co-authored publications. See Brief for Appellees at 9-10 (summarizing the outside reviews). In other words, all of their criticisms involve matters which have already been discredited as *actual* reasons for the University's tenure decision. Based on the evidence discussed above – indicating that Lawrence was misled into believing that she was meeting the applicable tenure standards and that male tenure candidates were not held to the same standards – a genuine factual

dispute remains as to the truthfulness of the Curators' proffered reasons for the adverse tenure decision.

Finally, the Curators' assert: "Lawrence received negative recommendations for promotion in six out of seven levels of review by the University." That assertion, however, merely begs the question of what motivated those negative tenure recommendations. Clearly, if those recommendations resulted in part from gender-based discrimination, they cannot serve as an independent basis for the adverse decision, and thereby insulate the Curators from liability. In the present case, Lawrence's strongest evidence of pretext corresponds with the earliest stages of the tenure review process. Moreover, it is reasonable to infer, based upon the evidence, that the negative opinions formed at the latter stages of the review process were largely influenced by the negative recommendations made at the earlier stages. The overall record of negative recommendations, upon which the Curators rely, simply cannot establish that the Curators are entitled to judgment as a matter of law.

In sum, because Lawrence has presented compelling affirmative evidence of pretext, and our *de novo* review requires us to resolve all reasonable inferences in favor of the non-moving party, I would hold that there is a genuine issue of fact concerning gender-based discrimination. Notwithstanding the Curators' repeated argument that Lawrence had a weaker application that her male counterparts, the comparison is somewhat beside the point in this case because there are genuine factual issues as to whether the key decision makers applied materially different standards to her and her male counterparts and, moreover, whether they gave her misleading signals about their expectations when she most needed to know what the applicable standards would be. Because I believe that gender-based discrimination can reasonably be inferred from the evidence, I conclude that the district court erred in granting summary judgment for the Curators.

I would reverse and remand for further proceedings.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.