Richard **DAY** and Calvin Hollowell, Plaintiffs,

v.

F.G. "Buddy" **VILLINES,** et al., Defendants.

Civ. No. LR–C–94–849.

United States District Court, E.D. Arkansas, Western Division.

Oct. 30, 1995.

**1266**

John W. Walker, Austin Porter, Jr., Mark T. Burnette, John W. Walker, P.A., Little Rock, AR, for Plaintiffs.

Stephen C. Engstrom, Wilson, Engstrom, Corum, Dudley & Coulter, Little Rock, AR, for Defendants.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

Plaintiffs filed this action pursuant to 42 U.S.C. §§ 1981, 1983, 2000e, and 1985. They claim that they were discharged because of their race, and in retaliation for exercising their First Amendment rights. Plaintiff Richard Day ("Day") also alleged that he was discharged in retaliation for having filed a previous lawsuit.

Day and plaintiff Calvin Hollowell ("Hollowell") are African American employees of the Pulaski County Sheriff's Department. Day has been employed since 1973, and has reached the rank of Captain. At the time this action was filed, he had responsibility as the general administrator of the Pulaski County Jail.

Hollowell was initially employed with the Sheriff's Department on January 1, 1981. He has attained the rank of Captain.

Defendant Randy Johnson ("Johnson") was elected Pulaski County Sheriff in November, 1994. In anticipation of assuming office, but prior to being sworn in as Sheriff, Johnson informed both Day and Hollowell, by letter dated December 12, 1994, that they would not be reappointed to their employment with the Sheriff's Department once Johnson assumed duties on January 1, 1995.

Plaintiffs then filed this action, and on December 28, 1994, the Court granted plaintiffs' request for a Temporary Restraining Order. The TRO has been in effect, by agreement of the parties, since December 28th.

On May 3, 1995, the Court granted defendants' motion for summary judgment in part. Plaintiffs filed an amended complaint reflecting that they wished to proceed against defendant Villines (Pulaski County Judge), and defendant Johnson.

The case was tried to an advisory jury beginning May 8, 1995. At the conclusion of the plaintiffs' case, the Court granted Villines' motion for judgment as a matter of law and dismissed the conspiracy claim against Villines. The Court also dismissed Day's retaliation claim against Johnson.

The remaining claims of racial discrimination under Title VII and First Amendment retaliation were submitted to the jury on interrogatories. The jury found in favor of Johnson on Hollowell's claim of race discrimination. The jury deadlocked with regard to plaintiffs' First Amendment claims and Day's race discrimination claim.[1]

---

1. The Court, in its July 10, 1995, Order finding that a retrial of the case was not warranted, stated "the responsibility for rendering a binding decision rests with the Court, who must prepare findings of fact and conclusions of law, and who may in its discretion accept or reject, in whole or in part, the jury's verdict. 9 Wright & Miller, *Federal Practice and Procedure: Civil 2d* § 2335 (1995)."

## FACTUAL BACKGROUND

Day is a long time employee of the Pulaski County Sheriff's Department. He began his employment as a patrolman in 1973, after serving for 2½ years in the Marines. He rose through the ranks of the Sheriff's department. He was jail administrator from 1981 through 1985. He was promoted to captain in 1983.

Hollowell began work in January 1, 1981, as a deputy sheriff. He also worked his way up the promotional ladder, finally becoming captain in February, 1994.[2] Day and Hollowell have extensive experience in both the enforcement and detention divisions of the sheriff's department. Hollowell has also served as the public information officer for the department.

Both Day and Hollowell have baccalaureate degrees. Day has a B.A. in criminal justice from the University of Arkansas. Hollowell has received two B.A. degrees from Philander Smith College, one in 1966 and one in 1972.

To understand the situation in which this case arose, a discussion of the history of the Pulaski County jail is necessary. The Pulaski County jail has been the subject of litigation and controversy over several decades. It was too small, and as a result of the case of *Hill v. Pulaski County*, LR–C–79–465 (E.D.Ark.) (the *Billy Hill* case), was operating under a Consent Decree which *inter alia*, placed a ceiling on the number of detainees and prohibited double bunking.

In February, 1990, the voters of Pulaski County approved a one-year, one penny sales tax dedicated for the purpose of building a new 800 bed regional jail. The tax generated approximately $36 million.

The new jail facility was intended to serve as a regional facility, replacing the municipal jails. Each of the municipalities in the county agreed to contribute certain sums on an annual basis to help defray the operating costs of the new facility.[3]

The new facility was to be constructed in such a manner that the direct supervision concept of handling inmates could be employed. That approach requires that detention officers use a more "hands-on" technique, supervising the inmates in the unit in which they are housed.

A number of committees were formed to oversee the construction of the new facility and the transition of operations from the old jail to the new jail. One of these committees was a transition team comprised of sheriff's employees. The County Judge at the time, Rita Gruber, hired Lowell Kincaid, former police chief of Sherwood and a former employee of the Federal Bureau of Prisons, to act as the Pulaski County Jail Planning Coordinator and to oversee the construction and implementation of the new jail. In addition, in 1993, the cities hired a jail consultant to review the jail budget and make cost saving recommendations.

During the planning stage of the new facility, a number of sheriff's employees served as coordinator of the transition team. Around February of 1993, Day replaced Captain White as the director of the transition team.

The planning and construction of the new jail were not without controversy. At the end of 1992, Sheriff Gravett announced a vacancy for position of Detention Administrator of a regional detention facility. Gravett appointed a committee of five citizens of Pulaski County to review the applications and to recommend a candidate. After review of the applications, the committee recommended the appointment of Day. In January, 1993, Gravett advised the Quorum Court of the selection of Day.

However, in February, 1993, the Pulaski County Quorum Court enacted two ordi-

---

**2.** Hollowell was terminated from the Sheriff's Department in May, 1985. He brought a civil rights action which was ultimately settled and Hollowell was reinstated in December, 1988. *See Hollowell v. Gravett*, 723 F.Supp. 107 (E.D.Ark.1989); *Hollowell v. Gravett*, 703 F.Supp. 761 (E.D.Ark.1988); *Hollowell v. Gravett*, 118 F.R.D. 473 (E.D.Ark.1987).

**3.** The Pulaski County jail facility which operated until August 1, 1994, will be referred to as the "old jail." The regional detention facility, which opened on August 1, 1994, will be referred to as the "new jail" or "new facility."

nances to transfer responsibility for the operation and maintenance of the jail from the sheriff to a civilian administrator who would operate the jail under the authority of the county judge. The Quorum Court also transferred the budget for the department from the sheriff to the county judge. Sheriff Gravett along with the Arkansas Sheriff's Association filed suit in Pulaski County Chancery Court contending *inter alia* that the ordinances violated the Arkansas Constitution. The Arkansas Supreme Court held that the removal of the operation of the county jail from the office of the sheriff can only be accomplished by a majority vote at a general election and only at the conclusion of the term of office. Thus, the court held the ordinances unconstitutional. *Gravett v. Villines*, 314 Ark. 320, 862 S.W.2d 260 (1993). However, during the six months the case was pending, matters concerning the new facility were virtually at a standstill, thereby delaying training of staff in the direct supervision method and the ultimate opening of the new jail.

In the meantime, Day had filed a lawsuit against the Quorum Court seeking to mandate the funding of the jail administrator position. The lawsuit was settled about nine months later when the Quorum Court approved a funding ordinance authorizing pay of $45,000.00 for Day as jail administrator.

The new facility opened on August 1, 1994, under the administration of Sheriff Carroll Gravett. The initial bed count for the new facility was 550; however, soon after the new facility opened the bed count was increased to 624. Nevertheless, within one month, the new facility was severely overcrowded. By the end of August, the number of inmates housed in the new facility reached over 700; by the middle of October, the head count was over 800.

The possibility of overcrowding had been discussed at length by the various committees prior to the opening of the new facility. The overcrowding caused severe problems in the new facility. Inmates were being held in the intake area; they were being delivered to court late; staff quit and positions were not filled. Many of the problems created by the overcrowding were alleviated with the opening of a warehouse facility in April of 1995 to house non-violent convicted misdemeanants. This unit is equipped to house approximately 175 inmates a day.

The problems associated with overcrowding were also aired in the media. Ultimately, the federal court received complaints about the conditions at the new jail and on September 7, 1994, the court held an informal conference to deal with the issue of whether it had jurisdiction over the new facility.[4] A number of representatives from the Sheriff's Department, including Day and Hollowell, were present. In addition, the county attorney and her assistant were present, along with counsel for the plaintiff class in *Billy Hill*.

The Court allowed the participants to comment. Both Gravett and Day expressed their concerns with the overcrowding. Day opined that conditions were ripe for a major riot. James Vandiver, who after completing his work as a consultant for Sedgewick/James, was appointed by Gravett to work on the overcrowding situation, stated that a number of measures had been taken to relieve overcrowding. Vandiver specifically stated: "Really and truly I don't think the sheriff or anybody else really wants this matter going back to federal court."

Johnson came to the courthouse, but was too late to attend the conference. Thus, he did not hear the comments. He later spoke with the county attorney about what transpired at the conference.

During the fall of 1994, several efforts were made to deal with the overcrowding issues. In addition, there were various changes in personnel. In the middle of October, Hollowell was transferred to the intake/transportation division and continued to serve as public information officer. Captain Oldham was moved to administrative/support division and Captain Hughes was assigned as commander of the security/housing division.

---

4. The undersigned also was the judge in the *Billy Hill* case, and conducted the September 7, 1994 hearing.

Day requested and received from the county funding for additional staff.

Nevertheless, the new jail continued to be overcrowded, staff positions remained unfilled, and detainees were not transported to court appearances in a timely manner.

At the peak of overcrowding, Hollowell, in an effort to alleviate what he perceived as an emergency situation, issued citations for the release of seven felons who had been ordered held without bond by the courts. The release of the felons on October 22, 1994, caught the media's attention and raised the ire of the prosecuting attorney for Pulaski County, Mark Stodola. Stodola requested that Hollowell appear before Municipal Judge Lee Munson and Circuit Judge John Langston to explain his actions.

According to Stodola, the release of the felons was in contravention of Rule 5.2 of the Arkansas Rules of Criminal Procedure, which provides:

> (a) A law enforcement officer in the field acting without a warrant who has reasonable cause to believe that a person has committed any misdemeanor may issue a citation in lieu of arrest or continued custody.

Stodola contended that Hollowell did not have authority to release the felons. Hollowell could only have done so after receiving authorization from either a prosecutor or a judge.

At the hearing before Judge Langston, a deputy prosecutor testified that he was available all weekend but had not received any telephone calls from the sheriff's office requesting the release of any prisoners.

Hollowell stated at both hearings that he had made a management decision in releasing the felons. The jail population was well over 800. Hollowell characterized the situation as an emergency, with the safety and security of both inmates and officers at stake.[5] He had directed the in-take clerk to notify the prosecutor on call. He later learned that the clerk had not reached the

prosecutor, but Hollowell himself did not take steps to attempt to reach the prosecutor.

Although both judges chastised Hollowell, no action was taken against him. He apologized and assured the judges that it would not happen again.

The new jail was an issue during the campaign. Johnson pledged to hire a "professional jail administrator." On November 8, 1994, Johnson was elected sheriff of Pulaski County. He put together a transition team and interviewed all employees at the rank of lieutenant and above on November 30 and December 1–2, 1994.

On November 30, 1994, Johnson and Danny Bradley, who is now Chief Deputy, met with Day. Johnson and Bradley met with Hollowell a few days later. Each interview lasted about thirty minutes.

During his interviews with Day and Hollowell, Johnson stated that he was opposed to federal court supervision of the jail. Johnson further asked what could be done about the problem in the intake unit and what was the mission of the new facility.

Johnson talked to Hollowell about his contact with the federal court. Johnson opined that Hollowell should have gone through the county attorney rather than communicating directly with the court. During his interview with Hollowell, Johnson also stated that Hollowell should not have released the felons.

On December 12, 1994, Johnson gave Day and Hollowell letters containing the following:

> After careful consideration, I have determined that the continued services of your employment with the Pulaski County Sheriff's Office would not be consistent with my administration. Therefore, you will not be reappointed when I assume the duties of Sheriff on January 1, 1995.

Johnson sent similar letters to his Republican opponent, Lt. Jerry Agnew, and to Gravett's Chief Deputy, Roy Henson. Both Agnew and Henson are white.

---

5. At the trial, Hollowell raised for the first time the assertion that he released some of the felons because several of them had AIDS. This information, or rationale, was not conveyed to the state court judges or to Johnson at the time of Hollowell's meeting with Johnson. The Court does not give any weight to this explanation, as it only surfaced at trial.

Johnson gave a number of reasons for his decision not to retain Day and Hollowell. In particular, Johnson stated that he did not believe that Day was managing the new jail appropriately. He criticized Day's use of the intake area as a housing unit. He also blamed Day for the failure to fill staff vacancies at the new facility. The bottom line, according to Johnson, was that he just did not have confidence that Day would manage in the way Johnson wanted.

Johnson also characterized a conversation he had with Day as confrontational. During the campaign, Day asked Johnson the latter's position about his desire to hire a "professional jail administrator." Day inquired whether Johnson considered Day a professional jail administrator and whether Johnson would consider him for the position. Johnson thought that Day was disrespectful for asking such questions.

Johnson stated that he did not retain Hollowell because he was of the opinion that the release of the seven felons without prior authorization demonstrated poor judgment by Hollowell. Johnson also said that Hollowell's work performance was poor, citing problems with transporting detainees to court in a timely manner and the problems in intake.

*Title VII*

■ Plaintiffs have the burden of establishing a prima facie case of discrimination. In this instance, plaintiffs must show that they are members of a protected class, they were qualified for the position at issue, they were not hired for (or fired from) the position, and after the rejection, the position remained open and the employer continued to seek applicants from persons of plaintiffs' qualifications. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). "The threshold of proof necessary to make a prima facie case is minimal ..." *Johnson v. Arkansas State Police*, 10 F.3d 547, 551 (8th Cir.1993).

■ Once plaintiffs establish a prima facie case of discrimination, defendants have the burden of production of articulating a legitimate, nondiscriminatory reason for the employment decision. That is, the defendant must set forth, through the introduction of admissible evidence, reasons for the action it took which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. *St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993).

■ If defendant carries this burden of production, plaintiff has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. Plaintiffs retain the ultimate burden of persuading the trier of fact that they were the victims of intentional discrimination. *Kobrin v. University of Minnesota*, 34 F.3d 698, 702 (8th Cir.1994).

■ There is no question that both plaintiffs have established a prima facie case of discrimination. Furthermore, the Court finds that Johnson has met his burden of production. Thus, the ultimate question is whether plaintiffs have proved that Johnson has intentionally discriminated against them because of their race. *See Hicks*, —— U.S. at ——, 113 S.Ct. at 2749.

The Court finds that plaintiffs have met their burden and that Johnson's rationale is pretextual. As noted above, Johnson had very little information about either Hollowell or Day at the time he made the decision to not retain them. In fact, all he could point to concerning his assessment of Day's management skills at the new jail was his reliance on newspaper articles, general talk in the community, and his own observations.

His own observations of plaintiffs' work performance were minimal, at best. He stated that he had been to the jail about three or four times from the time he was elected to December 12, 1994, for only a few hours each time. The Court is of the opinion that these visits to the jail were hardly sufficient for Johnson to adequately assess plaintiffs' work performance.

Johnson did not speak to Gravett, who had been plaintiffs' supervisor for almost ten years. Gravett considered both Day and Hollowell extremely competent employees. He characterized plaintiffs as intelligent, efficient, and knowledgeable. Gravett stated that he admired Day even more for doing an

admirable job with the new jail under what were difficult circumstances.

Johnson did, however, rely on information from some friends. This information is suspect. For example, Lowell Kincaid provided Johnson some negative information about Day based on his observations of Day's performance at transition team meetings. Kincaid, however, had no personal knowledge of Day's work performance or his qualifications.

Danny Bradley, who became Johnson's Chief Deputy, gave his opinion to Johnson. Bradley had no personal knowledge of the work performance of either Day or Hollowell. Bradley had no idea when Hollowell became in charge of intake. Nevertheless, he recommended that Johnson not retain either of the plaintiffs.

Skipper Polk, who Johnson brought in as a major, also voiced his opinion that Day and Hollowell should not be retained. Again, Polk had no personal knowledge of plaintiffs' work performance. He attributed all the problems in the new jail to Day.

There is no dispute that the first few months of the operation of the new jail were chaotic. Indeed, in a memorandum dated August 4, 1994, from James Vandiver to Laurie Gibbs, a consultant with Sedgewick James, Vandiver states: "All in all things are going was [sic] well as can be expected for a project of this magnitude. I think, some of the employees of the Jail Division had unrealistic expectations that the transition would be perfect and are a little disappointed, however, I believe with the proper management attitude and resolve, improvements will occur. The employees are to be commended for a job well done."

In a memorandum written two weeks later, Vandiver notes that the "most pressing issue at this time is jail overcrowding ..." Unfortunately, the problems continued as the number of detainees increased. Detainees were being housed in the intake area, creating a security risk. Day characterized the management of the new jail from August 1, 1994 through December, 1994, as "crisis management."

The testimony revealed that Day and Hollowell attempted on more than one occasion to cope with the problem. They were met with a lack of cooperation from the municipal judges, the county attorney, and the prosecutor's office.

Johnson appears to assign all the blame for the problems in the new jail on Day, from the delay in the opening of the new facility to the problems with overcrowding. This justification for failing to retain Day is just too broad to withstand scrutiny. The evidence reveals that a number of factors contributed to the delay in opening the new facility, including the six month delay resulting from the lawsuit over control of the jail. Furthermore, everyone involved with the planning of the new jail anticipated that it would be overcrowded. Staff turnover was also expected as a result of the change to a direct supervision facility. Indeed, the new jail facility remains overcrowded. The direct supervision method has not been fully implemented.

Johnson criticized Day for failing to assign captains to work weekend and evening shifts. He believed Day did not have any experience in direct supervision. Day, and others, however, testified that Day was at the new jail regularly from 9:00 a.m. to 9:00 p.m. Day further testified that he had training in direct supervision, but that Johnson had never asked him about that.

Johnson was particularly critical of Day's use of the intake area as a housing unit. Day stated that he used both the pods and the intake area to place the overflow of inmates and detainees. There was certainly some disagreement even among department personnel at the time as to the use of the intake area. However, Day never indicated in his interview or during any discussion with Johnson that his position regarding intake was unalterable or not subject to modification.

Johnson criticized Day for failing to fill vacancies. Yet, a number of persons with the Sheriff's Department, including Sheriff Gravett, were of the opinion that vacancies could not be filled until all the time the incumbent had remaining had actually run. While this belief turned out to be erroneous, Day's reliance on it, as the common policy

and practice of the Sheriff's Department, was certainly rational and justifiable. Had Johnson investigated the matter, he would have determined that Day was acting pursuant to common policy.

Perhaps most telling of the pretextual nature of Johnson's justification is his own hiring practices. He hired three white males to fill the top policy making posts. All three were retired North Little Rock police officers. Johnson certainly had the right to bring in his own chiefs. However, the experience and qualification of the three top level administrators pale in comparison to that of Day or Hollowell. None of the three had college degrees. Only one of the three had attained the rank of captain; the other two had only reached the rank of sergeant and lieutenant.

Also probative of Johnson's discriminatory attitude is his treatment of Captain Talley and his policy regarding lateral transfers. After the opening of the new facility, Talley was transferred to head the judicial division. He was the highest ranking African-American outside of detention. Johnson decided to transfer Talley back to detention. Such a move had the effect of locking Talley into the detention career path, as Johnson has enacted a new policy of not allowing lateral transfers between detention and enforcement. The detention division traditionally has had a larger percentage of African-American employees than other divisions in the Sheriff's Department. Thus, the new policy regarding transfers will lock African-Americans in what is considered by some as a less desirable position in detention, without the opportunity to work in enforcement.

Talley stated that he did not want to move back to enforcement but was not asked his opinion or preference. Johnson did, however, ask Captain Jim White, a white employee, his work preference during the interview and honored it. Furthermore, Danny Bradley, Johnson's Chief Deputy who was involved in the decision to transfer Talley, did not make any assessment of Talley's work experience in deciding that Talley was needed in detention. Bradley did not even know that Talley had experience in judicial and did not consult Talley's personnel file.

Thus, as of the date of trial, the only African-American captains were located in detention. All other divisions are headed by white employees.

Johnson did not ask Day about other positions and did not consider Day for any other position. Johnson had decided to hire a "professional jail administrator" and Day was not going to be it. However, as Day stated, he has experience as a commander in every division. There is no indication that Johnson even bothered to obtain any background information on Day. It is incredible that an employer would reject a veteran employee who has a college degree in criminal justice and has served four sheriffs satisfactorily. Indeed, the Court finds that Day's questioning of Johnson about whether he would be considered a professional jail administrator hardly indicates disrespect on Day's part. Rather, it indicates a concern by Day that he be regarded as a serious, seasoned employee of the sheriff's department.

Johnson attempts to argue that Day is not similarly situated to other captains, that is, as the jail administrator he is in an unclassified, policy making position. Johnson said that he was justified in not retaining Day in what is a second in command level position in the Sheriff's Department.

Johnson's attempt to make Day a top level administrator similar to Chief Deputy is without merit. Although Day's position was unclassified, he was regarded by his co-workers and by Sheriff Gravett as a Captain. And, although he reported to Gravett rather than the Chief Deputy, Gravett did not regard Day's position as that on a par with Chief Deputy.

Furthermore, Johnson requested funding from the Quorum Court for the Chief of Detention Operations as a new position to be filled as of January 1, 1995. A comparison of Day's salary with that proposed for the Chief of Detention Operations reveals that Day's position as jail coordinator is not similar to that envisioned by Johnson. Day's salary of about $45,000.00 is similar to that of other captains; the proposed salary for Chief of Detention Operations is $60,000 to $70,000. Even Day recognizes that he is not guaran-

teed the position and that Johnson is free to hire his own Chief of Detention Operations.

Thus, the Court finds that Johnson's rationale that Day, as jail coordinator, was not really a captain, but was one of the top level policy makers who are traditionally replaced with new administrations, is without merit. Day is first and foremost a captain with the Sheriff's department. Johnson cannot offer any justification for failing to retain Day as a captain. While he may not have thought Day would function in the way Johnson wanted as the jail administrator, there is no indication that Day would not function as a competent captain.

Similarly, the Court must find the rationale for failing to retain Hollowell to be pretextual. Johnson had not obtained all the relevant information in characterizing Hollowell's decision as "exceedingly bad judgment."

While the release of the felons may not have been an exercise in good judgment in Johnson's mind, it was an action that was condoned by Hollowell's superior at the time, and for which Hollowell believed he had authority. Even the state court judges were somewhat sympathetic to the situation. Judge Munson, at the hearing held on October 28, 1994, stated:

> I am also aware of the overcrowding ... Captain Hollowell came by my officer earlier this week. We've talked. He understands that there has been a mistake made and I don't think it will occur again after all these proceedings. He needs some direction from the Prosecutor's Office, of course.
>
> .    .    .    .    .
>
> Something has got to be done, we're going to have to get hold of the situation and provide some leadership and provide a facility to put these people in where we don't have to bring Captain Hollowell in here with this problem. His problem has been created ... yes, some by the courts, but the courts have to do their jobs, too, and you [the prosecutor] have to do yours. You have to bring these people before me or before circuit judges and do what the statues and the law dictates.

In any event, Hollowell apologized for the decision and assured all those involved that it would not happen again.

Furthermore, Johnson attributed the problems with intake and staffing to Hollowell. Hollowell, however, was not in charge of intake until the middle of October, and therefore can hardly be accountable for the deplorable conditions in intake that were displayed in the newspaper in September, 1994.

In sum, the Court is left with the conclusion that Johnson did not retain Day and Hollowell because they are African–American. Johnson had very little information about either plaintiff or their qualifications. He relied on media accounts and comments from his white friends. Thus, the Court finds that Johnson's failure to retain Day and Hollowell was discriminatory and that they are entitled to be reinstated.

*First Amendment*

Plaintiffs also contend that they were not retained in retaliation for exercising their First Amendment rights. In particular, Day claims that Johnson did not retain him because of his involvement before the federal court with regard to the *Billy Hill* case. Hollowell contends that Johnson did not retain him because he spoke out about the conditions at the new jail facility and that he brought the issue to the federal court.

There is no dispute that Johnson raised the issue of federal court jurisdiction in his interviews with only Day and Hollowell. He was opposed to Hollowell going to federal court. In particular, Johnson asked Hollowell why he had taken the issue of overcrowding to the federal court without going through the county attorney. Johnson told Day that he did not believe that the new jail should be in federal court.

Gravett was in favor of notifying the federal court of the problem with overcrowding believing that such may be required under the *Billy Hill* consent decree or to avoid any possible lawsuits. For example, in the middle of August, 1994, Gravett informed Judge Villines of the need to inform the federal court of the overcrowding at the new facilities and Gravett's desire to request funding to double-bunk certain housing units. He

also requested that Villines instruct the county attorney to take the necessary steps to so inform the federal court.

Gravett directed Hollowell to contact the federal court about the problem with overcrowding. Hollowell stated that he first attempted to contact the county attorney. He also stated that in an effort to get relief he contacted the head of the Arkansas chapter of the American Civil Liberties Union. Furthermore, Hollowell talked to the press about the problems created by overcrowding.

■ Hollowell's actions in contacting the Court and in making public statements about the conditions at the jail are protected by the First Amendment. *See Connick v. Myers,* 461 U.S. 138, 143, 103 S.Ct. 1684, 1688, 75 L.Ed.2d 708 (1983). That is, the Court finds that Hollowell's actions involved matters of public concern, the conditions of the new jail facility. There is no evidence that Hollowell's actions were disruptive as they were done as part of his duties as public information officer and at the request of his superior. Furthermore, Hollowell, in acting pursuant to Gravett's direction, attempted to contact county officials prior to approaching the federal court.

■ Hollowell must next show that the protected activity was a substantial or motivating factor in Johnson's decision not to retain him *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). The Court finds that Hollowell has met this burden.

As noted previously, Johnson stated during the interview that Hollowell should not have contacted the federal court. Johnson did not attempt to determine whether Hollowell was instructed to do so by his superior. Johnson was also not aware of all the circumstances surrounding Hollowell's actions. Rather, Johnson opined that Hollowell's protected activities were inappropriate and warranted being raised during the interview.

Johnson must then show that he would have not retained him irrespective of Hollowell's First Amendment activity. *Lewis v. Harrison Sch. Dist. No. 1,* 805 F.2d 310, 313 (8th Cir.1986). The Court finds that Johnson has failed to meet this burden. Johnson

knew very little about Hollowell. He knew what he had read in the newspapers, that is that Hollowell had contacted the federal court and had voiced concern over the overcrowding in the new jail. Johnson also knew that Hollowell had released seven felons. For the reasons discussed above under the Title VII claim, Johnson's reliance on Hollowell's release of the seven felons as justification to not retain him is pretextual.

Johnson did not want federal court involvement in the new jail, and did not want his employees contacting the federal court. Such beliefs are certainly reasonable, understandable and justifiable. Nevertheless, he expressed disapproval for actions Hollowell took under a different administration, with a different philosophy. In sum, the Court finds that Johnson did not retain Hollowell in retaliation for Hollowell's exercise of his First Amendment rights.

■ The Court, however, cannot find that Johnson did not retain Day for engaging in protected activity. Other than his comments during the September 7, 1994, hearing, Day did not make any public statements regarding *Billy Hill* or federal jurisdiction. His comments during the September 7th meeting were no more than a report of the conditions at the new facility. Assuming that Day's appearance before the Court on September 7th was protected speech, Johnson was not present and was not aware of what Day said. Furthermore, Day along with a number of other sheriff's department representatives spoke about the jail conditions. Day's comments were no more or less supportive of federal court jurisdiction than the comments of other employees. During his interview, Day did not express any opinion regarding federal court jurisdiction to Johnson.

In sum, the Court finds that Hollowell has established that Johnson violated his First Amendment rights in failing to retain him. The Court finds that Johnson did not violate Day's First Amendment rights.

*County's Request for Attorneys' Fees*

■ The Court granted summary judgment in favor of the Quorum Court on May 3, 1995. In addition, the Court dismissed plaintiffs' Title VII claim against Vil-

lines. Counsel for the Quorum Court seek attorneys' fees in the amount of $28,000.00 and costs of $1,129.75. The Court granted judgment as a matter of law in favor of Villines on plaintiffs' conspiracy claim at the close of plaintiffs' case. Villines seeks $1,404.44 in costs and attorneys' fees in the amount of $75,173.00.

"A court may award prevailing defendants attorney's fees under section 1988 only if the plaintiff's claim was 'frivolous, unreasonable, or groundless, or ... the plaintiff continued to litigate after it clearly became so.'" *Flowers v. Jefferson Hospital Ass'n,* 49 F.3d 391, 391 (8th Cir.1995) (quoting *Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n,* 434 U.S. 412, 422, 98 S.Ct. 694, 700–01, 54 L.Ed.2d 648 (1978)). A court should award attorneys' fees to prevailing Title VII defendants in only very narrow circumstances. *Marquart v. Lodge 837,* 26 F.3d 842, 849, 852 (8th Cir.1994).

■ The Court cannot find that plaintiffs did not have a reasonable basis to bring claims against the Quorum Court and Villines. With respect to the Quorum Court, there was evidence upon which plaintiffs could rely to believe that the Quorum Court had some role in the actions taken against plaintiffs, particularly Day. The Quorum Court attempted to take control of the jail at the time Gravett selected Day as the jail administrator. The Quorum Court had some role in the creation and funding of certain positions within the jail. Even Gravett opined that the Quorum Court was opposed to Day's appointment as jail administrator because Day is African American. Thus, plaintiffs' claims against the Quorum Court were not frivolous or groundless.

■ Plaintiffs had even a stronger basis for pursuing their conspiracy claim against Villines. Villines participated in discussions concerning the conditions at the new jail, and was opposed to Gravett's desire to report to the federal court. Furthermore, Villines along with a number of his representatives were involved in the planning of the new jail and met with Johnson prior to Johnson's decision to not reappoint plaintiffs. Thus, as the Court noted in its order of May 3, 1995, questions of fact existed as to Villines' role in Johnson's decision not to reappoint plaintiffs, and plaintiffs' claims against Villines were not frivolous, unreasonable or groundless.

## CONCLUSION

In sum, the Court finds in favor of plaintiffs on their Title VII claims against Johnson. The Court finds in favor of Hollowell on his First Amendment claim against Johnson. The Court dismisses Day's First Amendment claim against Johnson.

Plaintiffs are entitled to injunctive relief. The Court notes that Johnson has redefined the position of jail administrator to Chief of Detention Operations. This position is different from that occupied by Day, and as recognized by Day, one to which he is not entitled. Nevertheless, the Court finds that both Day and Hollowell have reached the rank of captain and therefore should be placed in positions at the captain level within the Sheriff's Department.

Plaintiffs are also entitled to reasonable attorney's fees and costs. The parties are directed to attempt to resolve these matters within two weeks from the date of this Order. Should they be unable to do so, plaintiffs may file the appropriate motion seeking an award of costs and fees.

The motions of the Quorum Court and Villines for attorney's fees and costs are denied.

IT IS SO ORDERED.

### *JUDGMENT*

Pursuant to the Memorandum Opinion and Order entered this date, judgment is entered in favor of plaintiffs on their Title VII claim against Johnson. Judgment is also entered in favor of Hollowell on his First Amendment claim against Johnson. Day's First Amendment claim against Johnson is dismissed. Defendant is directed to retain plaintiffs in a position at the level of captain.

IT IS SO ORDERED.