Justice Alito,
with whom
The Chief Justice, Justice Scalia, and Justice Thomas join, dissenting.
The proudest boast of our free speech jurisprudence is that we protect the freedom to express “the thought that we hate.” United States v. Schwimmer, 279 U. S. 644, 654-655 (1929) (Holmes, J., dissenting). Today’s decision rests on a very different principle: no freedom for expression that offends prevailing standards of political correctness in our country’s institutions of higher learning.
The Hastings College of the Law, a state institution, permits student organizations to register with the law school *707 and severely burdens speech by unregistered groups. Hastings currently has more than 60 registered groups and, in all its history, has denied registration to exactly one: the Christian Legal Society (CLS). CLS claims that Hastings refused to register the group because the law school administration disapproves of the group’s viewpoint and thus violated the group’s free speech rights.
Rejecting this argument, the Court finds that it has been Hastings’ policy for 20 years that all registered organizations must admit any student who wishes to join. Deferring broadly to the law school’s judgment about the permissible limits of student debate, the Court concludes that this “accept-all-comers” policy, ante, at 668, is both viewpoint neutral and consistent with Hastings’ proclaimed policy of fostering a diversity of viewpoints among registered student groups.
The Court’s treatment of this case is deeply disappointing. The Court does not address the constitutionality of the very different policy that Hastings invoked when it denied CLS’s application for registration. Nor does the Court address the constitutionality of the policy that Hastings now purports to follow. And the Court ignores strong evidence that the accept-all-comers policy is not viewpoint neutral because it was announced as a pretext to justify viewpoint discrimination. Brushing aside inconvenient precedent, the Court arms public educational institutions with a handy weapon for suppressing the speech of unpopular groups — groups to which, as Hastings candidly puts it, these institutions “do not wish to . . . lend their name[s].” Brief for Respondent Hastings College of the Law 11; see also id., at 35.
I
The Court provides a misleading portrayal of this case. As related by the Court, (1) Hastings, for the past 20 years, has required any student group seeking registration to admit any student who wishes to join, ante, at 671-672; (2) the ef *708 fects of Hastings’ refusal to register CLS have been of questionable importance, see ante, at 690-691; and (3) this case is about CLS’s desire to obtain “a state subsidy,” ante, at 682. I begin by correcting the picture.
A
The Court bases all of its analysis on the proposition that the relevant Hastings’ policy is the so-called accept-all-comers policy. This frees the Court from the difficult task of defending the constitutionality of either the policy that Hastings actually — and repeatedly — invoked when it denied registration, i. e., the school’s written Nondiscrimination Policy, or the policy that Hastings belatedly unveiled when it filed its brief in this Court. Overwhelming evidence, however, shows that Hastings denied CLS’s application pursuant to the Nondiscrimination Policy and that the accept-all-comers policy was nowhere to be found until it was mentioned by a former dean in a deposition taken well after this case began.
The events that gave rise to this litigation began in 2004, when a small group of Hastings students sought to register a Hastings chapter of CLS, a national organization of Christian lawyers and law students. All CLS members must sign a Statement of Faith affirming belief in fundamental Christian doctrines, including the belief that the Bible is “the inspired Word of God.” App. 226. In early 2004, the national organization adopted a resolution stating that “[i]n view of the clear dictates of Scripture, unrepentant participation in or advocacy of a sexually immoral lifestyle is inconsistent with an affirmation of the Statement of Faith, and consequently may be regarded by CLS as disqualifying such an individual from CLS membership.” Id., at 146. The resolution made it clear that “a sexually immoral lifestyle,” in CLS’s view, includes engaging in “acts of sexual conduct outside of God’s design for marriage between one man and one woman.” Ibid. It was shortly after this resolution was passed that *709 the Hastings chapter of CLS applied to register with the law school.
Hastings sponsors an active program of “registered student organizations” (RSOs) pursuant to the law school’s avowed responsibility to “ensure an opportunity for the expression of a variety of viewpoints” and promote “the highest standards of. .. freedom of expression,” App. to Pet. for Cert. 82a, 74a. During the 2004-2005 school year, Hastings had more than 60 registered groups, including political groups (e. g., the Hastings Democratic Caucus and the Hastings Republicans), religious groups (e. g., the Hastings Jewish Law Students Association and the Hastings Association of Muslim Law Students), groups that promote social causes (e. g., both pro-choice and pro-life groups), groups organized around racial or ethnic identity (e. g., the Black Law Students Association, the Korean American Law Society, La Raza Law Students Association, and the Middle Eastern Law Students Association), and groups that focus on gender or sexuality (e. g., the Clara Foltz Feminist Association and Students Raising Consciousness at Hastings). See App. 236-245; Brief for Petitioner 3-4.
Not surprisingly many of these registered groups were and are dedicated to expressing a message. For example, Silenced Right, a pro-life group, taught that “all human life from the moment of conception until natural death is sacred and has inherent dignity,” App. 244, while Law Students for Choice aimed to “defend and expand reproductive rights,” id., at 243. The American Constitution Society sought “to counter ... a narrow conservative vision” of “American law,” id., at 236, and the UC Hastings Student Animal Defense Fund aimed “at protecting the lives and advancing the interests of animals through the legal system,” id., at 245.
Groups that are granted registration are entitled to meet on university grounds and to access multiple channels for communicating with students and faculty — including posting messages on designated bulletin boards, sending mass *710 e-mails to the student body, distributing material through the Student Information Center, and participating in the annual student organizations fair. App. to Pet. for Cert. 7a, 85a. They may also apply for limited travel funds, id., at 7a, which appear to total about $4,000 to $5,000 per year, App. 217 — or less than $85 per registered group. Most of the funds available to RSOs come from an annual student activity fee that every student must pay. See App. to Pet. for Cert. 89a-93a.
When CLS applied for registration, Judy Hansen Chapman, the Director of Hastings’ Office of Student Services, sent an e-mail to an officer of the chapter informing him that “CLS’s bylaws did not appear to be compliant” with the Hastings Nondiscrimination Policy, App. 228, 277, a written policy that provides in pertinent part that “[t]he University of California, Hastings College of the Law shall not discriminate unlawfully on the basis of race, color, religion, national origin, ancestry, disability, age, sex or sexual orientation,” id., at 220. As far as the record reflects, Ms. Chapman made no mention of an aceept-all-applicants policy.
A few days later, three officers of the chapter met with Ms. Chapman, and she reiterated that the CLS bylaws did not comply with “the religion and sexual orientation provisions of the Nondiscrimination Policy and that they would need to be amended in order for CLS to become a registered student organization.” Id., at 228. About a week later, Hastings sent CLS a letter to the same effect. Id., at 228-229, 293-295. On both of these occasions, it appears that not a word was said about an aecept-all-comers policy.
When CLS refused to change its membership requirements, Hastings denied its request for registration — thus making CLS the only student group whose application for registration has ever been rejected. Brief in Opposition 4.
In October 2004, CLS brought this action under 42 U. S. C. §1983 against the law school’s dean and other school officials, claiming, among other things, that the law school, by *711 enacting and enforcing the Nondiscrimination Policy, had violated CLS’s First Amendment right to freedom of speech. App. 78.
In May 2005, Hastings filed an answer to CLS’s first amended complaint and made an admission that is significant for present purposes. In its complaint, CLS had alleged that the Nondiscrimination Policy discriminates against religious groups because it prohibits those groups “from selecting officers and members dedicated to a particular set of religious ideals or beliefs” but “permits political, social and cultural student organizations to select officers and members dedicated to their organization’s ideals and beliefs.” Id., at 79. In response, Hastings admitted that its Nondiscrimination Policy “permits political, social, and cultural student organizations to select officers and members who are dedicated to a particular set of ideals or beliefs.” Id., at 93. The Court states that “Hastings interprets the Nondiscrimination Policy, as it relates to the RSO program, to mandate acceptance of allcomers.” Ante, at 671. But this admission in Hastings’ answer shows that Hastings had not adopted this interpretation when its answer was filed.
Within a few months, however, Hastings’ position changed. In July 2005, Mary Kay Kane, then the dean of the law school, was deposed, and she stated: “It is my view that in order to be a registered student organization you have to allow all of our students to be members and full participants if they want to.” App. 343. In a declaration filed in October 2005, Ms. Chapman provided a more developed explanation, stating: “Hastings interprets the Nondiscrimination Policy as requiring that student organizations wishing to register with Hastings allow any Hastings student to become a member and/or seek a leadership position in the organization.” Id., at 349.
Hastings claims that this accept-all-comers policy has existed since 1990 but points to no evidence that the policy was ever put in writing or brought to the attention of mem *712 bers of the law school community prior to the dean’s deposition. Indeed, Hastings has adduced no evidence of the policy’s existence before that date. And while Dean Kane and Ms. Chapman stated, well after this litigation had begun, that Hastings had such a policy, neither they nor any other Hastings official has ever stated in a deposition, affidavit, or declaration when this policy took effect.
Hastings’ effort to portray the accept-all-comers policy as merely an interpretation of the Nondiscrimination Policy runs into obvious difficulties. First, the two policies are simply not the same: The Nondiscrimination Policy proscribes discrimination on a limited number of specified grounds, while the accept-all-comers policy outlaws all selectivity. Second, the Nondiscrimination Policy applies to everything that Hastings does, and the law school does not follow an accept-all-comers policy in activities such as admitting students and hiring faculty.
In an effort to circumvent this problem, the Court writes that “Hastings interprets the Nondiscrimination Policy, as it relates to the RSO program, to mandate acceptance of all comers.” Ante, at 671 (emphasis added). This puts Hastings in the implausible position of maintaining that the Nondiscrimination Policy means one thing as applied to the RSO program and something quite different as applied to all of Hastings’ other activities. But the Nondiscrimination Policy by its terms applies fully to all components of the law school, “including administration [and] faculty.” App. 220.
Third, the record is replete with evidence that, at least until Dean Kane unveiled the accept-all-comers policy in July 2005, Hastings routinely registered student groups with bylaws limiting membership and leadership positions to those who agreed with the groups’ viewpoints. For example, the bylaws of the Hastings Democratic Caucus provided that “any full-time student at Hastings may become a member of HDC so long as they do not exhibit a consistent disregard and lack of respect for the objective of the organization as *713 stated in Article 3, Section 1.” App. to Pet. for Cert. 118a (emphasis added). The constitution of the Association of Trial Lawyers of America at Hastings provided that every member must “adhere to the objectives of the Student Chapter as well as the mission of ATLA.” Id., at 110a. A student could become a member of the Vietnamese American Law Society so long as the student did not “exhibit a consistent disregard and lack of respect for the objective of the organization,” which centers on a “celebration] [of] Vietnamese culture.” Id., at 146a-147a. Silenced Right limited voting membership to students who “are committed” to the group’s “mission” of “spreading] the pro-life message.” Id., at 142a-143a. La Raza limited voting membership to “students of Raza background.” App. 192. Since Hastings requires any student group applying for registration to submit a copy of its bylaws, see id., at 249-250, Hastings cannot claim that it was unaware of such provisions. And as noted, CLS was denied registration precisely because Ms. Chapman reviewed its bylaws and found them unacceptable.
We are told that, when CLS pointed out these discrepancies during this litigation, Hastings took action to ensure that student groups were in fact complying with the law school’s newly disclosed accept-all-eomers policy. For example, Hastings asked La Raza to revise its bylaws to allow all students to become voting members. App. to Pet. for Cert. 66a. See also Brief for State of Michigan et al. as Amici Curiae 2, n. 1 (relating anecdotally that Hastings recently notified the Hastings Democrats that “to maintain the Club’s standing as a student organization,” it must “open its membership to all students, irrespective of party affiliation”). These belated remedial efforts suggest, if anything, that Hastings had no aceept-all-comers policy until this litigation was well under way.
Finally, when Hastings filed its brief in this Court, its policy, which had already evolved from a policy prohibiting certain specified forms of discrimination into an accept-all- *714 comers policy, underwent yet another transformation. Now, Hastings claims that it does not really have an accept-all-comers policy; it has an aceept-some-comers policy. Hastings’ current policy, we are told, “does not foreclose neutral and generally applicable membership requirements unrelated to ‘status or beliefs.’” Brief for Respondent Hastings College of the Law 5. Hastings’ brief goes on to note with seeming approval that some registered groups have imposed “even conduct requirements.” Ibid. Hastings, however, has not told us which “conduct requirements” are allowed and which are not — although presumably requirements regarding sexual conduct fall into the latter category.
When this case was in the District Court, that court took care to address both the Nondiscrimination Policy and the accept-all-comers policy. See, e. g., App. to Pet. for Cert. 8a-9a, 16a-17a, 21a-24a, 26a, 27a, 32a, 44a, 63a. On appeal, however, a panel of the Ninth Circuit, like the Court today, totally ignored the Nondiscrimination Policy. CLS’s argument in the Ninth Circuit centered on the Nondiscrimination Policy, and CLS argued strenuously, as it had in the District Court, that prior to the former dean’s deposition, numerous groups had been permitted to restrict membership to students who shared the groups’ views.[1] Nevertheless, the *715 Ninth Circuit disposed of CLS’s appeal with a two-sentence, not-precedential opinion that solely addressed the accept-all-comers policy. Christian Legal Soc. Chapter of Univ. of Cal. v. Kane, 319 Fed. Appx. 645-646 (2009).
Like the majority of this Court, the Ninth Circuit relied on the following Joint Stipulation, which the parties filed in December 2005, well after Dean Kane’s deposition:
“Hastings requires that registered student organizations allow any student to participate, become a member, or seek leadership positions in the organization, regardless of their status or beliefs.” App. 221.
Citing the binding effect of stipulations, the majority sternly rejects what it terms “CLS’s unseemly attempt to escape from the stipulation and shift its target to [the Nondiscrimination Policy].” Ante, at 678.
I agree that the parties must be held to their Joint Stipulation, but the terms of the stipulation should be respected. What was admitted in the Joint Stipulation filed in December 2005 is that Hastings had an accept-all-comers policy. CLS did not stipulate that its application had been denied more than a year earlier pursuant to such a policy. On the contrary, the Joint Stipulation notes that the reason repeatedly given by Hastings at that time was that the CLS bylaws did not comply with the Nondiscrimination Policy. See App. 228-229. Indeed, the parties did not even stipulate that the accept-all-comers policy existed in the fall of 2004. In addition, Hastings itself is now attempting to walk away from this stipulation by disclosing that its real policy is an accept-some-comers policy.
*716 The majority’s insistence on the binding effect of stipulations contrasts sharply with its failure to recognize the binding effect of a party’s admissions in an answer. See American Title Insurance Co. v. Lacelaw Corp., 861 F. 2d 224, 226 (CA9 1988) (“Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them”); Bakersfield Westar Ambulance, Inc. v. Community First Bank, 123 F. 3d 1243, 1248 (CA9 1997) (quoting Lacelaw, supra). As noted above, Hastings admitted in its answer, which was filed prior to the former dean’s deposition, that at least as of that time, the law school did not follow an accept-all-comers policy and instead allowed “political, social, and cultural student organizations to select officers and members who are dedicated to a particular set of ideals or beliefs.” App. 93.
B
The Court also distorts the record with respect to the effect on CLS of Hastings’ decision to deny registration. The Court quotes a letter written by Hastings’ general counsel in which she stated that Hastings “ ‘would be pleased to provide [CLS] the use of Hastings facilities for its meetings and activities.’” Ante, at 673 (quoting App. 294). Later in its opinion, the Court reiterates that “Hastings offered CLS access to school facilities to conduct meetings,” ante, at 690, but the majority does not mention that this offer was subject to important qualifications. As Hastings’ attorney put it in the District Court, Hastings told CLS: “‘Hastings allows community groups to some degree to use its facilities, sometimes on a pay basis, I understand, if they’re available after priority is given to registered organizations.’ We offered that.” App. 442.
The Court also fails to mention what happened when CLS attempted to take advantage of Hastings’ offer. On August 19, 2005, the local CLS president sent an e-mail to Ms. Chapman requesting permission to set up an “advice *717 table” on a campus patio on August 23 and 24 so that members of CLS could speak with students at the beginning of the fall semester. Id., at 298. This request — merely to set up a table on a patio — could hardly have interfered with any other use of the law school’s premises or cost the school any money. But although the request was labeled “time sensitive,” ibid., Ms. Chapman did not respond until the dates in question had passed, and she then advised the student that all further inquiries should be made through CLS’s attorney id., at 297-298.
In September 2005, CLS tried again. Through counsel, CLS sought to reserve a room on campus for a guest speaker who was scheduled to appear on a specified date. Id., at 302-303. Noting Ms. Chapman’s tardy response on the prior occasion, the attorney asked to receive a response before the scheduled date, but once again no answer was given until after the date had passed. Id., at 300.
Other statements in the majority opinion make it seem as if the denial of registration did not hurt CLS at all. The Court notes that CLS was able to hold Bible-study meetings and other events. Ante, at 673. And “[although CLS could not take advantage of RSO-specific methods of communication,” the Court states, “the advent of electronic media and social-networking sites reduces the importance of those channels.” Ante, at 690-691.
At the beginning of the 2005 school year, the Hastings CLS group had seven members, App. to Pet. for Cert. 13a, so there can be no suggestion that the group flourished. And since one of CLS’s principal claims is that it was subjected to discrimination based on its viewpoint, the majority’s emphasis on CLS’s ability to endure that discrimination — by using private facilities and means of communication — is quite amazing.
This Court does not customarily brush aside a claim of unlawful discrimination with the observation that the effects of the discrimination were really not so bad. We have never *718 before taken the view that a little viewpoint discrimination is acceptable. Nor have we taken this approach in other discrimination cases.
C
Finally, I must comment on the majority’s emphasis on funding. According to the majority, CLS is “seeking what is effectively a state subsidy,” ante, at 682, and the question presented in this case centers on the “use of school funds,” ante, at 668. In fact, funding plays a very small role in this case. Most of what CLS sought and was denied — such as permission to set up a table on the law school patio — would have been virtually cost free. If every such activity is regarded as a matter of funding, the First Amendment rights of students at public universities will be at the mercy of the administration. As CLS notes: “[T]o university students, the campus is their world. The right to meet on campus and use campus channels of communication is at least as important to university students as the right to gather on the town square and use local communication forums is to the citizen.” Reply Brief for Petitioner 18.
II
To appreciate how far the Court has strayed, it is instructive to compare this case with Healy v. James, 408 U. S. 169 (1972), our only First Amendment precedent involving a public college’s refusal to recognize a student group. The group in Healy was a local chapter of the Students for a Democratic Society (SDS). When the students who applied for recognition of the chapter were asked by a college committee whether they would “ 'respond to issues of violence as other S.D.S. chapters have,’ ” their answer was that their “ 'action would have to be dependent upon each issue.’ ” Id., at 172-173. They similarly refused to provide a definitive answer when asked whether they would be willing to “use any means possible” to achieve their aims. Id., at 173. The president of the college refused to allow the group to be rec *719 ognized, concluding that the philosophy of the SDS was “antithetical to the school’s policies” and that it was doubtful that the local chapter was independent of the national organization, the “ 'published aims and philosophy’ ” of which included “ 'disruption and violence.’ ” Id., at 174-175, and n. 4.
The effects of nonrecognition in Healy were largely the same as those present here. The SDS was denied the use of campus facilities, as well as access to the customary means used for communication among the members of the college community. Id., at 176, 181-182.
The lower federal courts held that the First Amendment rights of the SDS chapter had not been violated, and when the case reached this Court, the college, much like today’s majority, sought to minimize the effects of nonrecognition, arguing that the SDS members “still may meet as a group off campus, that they still may distribute written material off campus, and that they still may meet together informally on campus ... as individuals.” . Id., at 182-183.
This Court took a different view. The Court held that the denial of recognition substantially burdened the students’ right to freedom of association. After observing that “[t]he primary impediment to free association flowing from nonrecognition is the denial of use of campus facilities for meetings. and other appropriate purposes,” id., at 181, the Court continued:
“Petitioners’ associational interests also were circumscribed by the denial of the use of campus bulletin boards and the school newspaper. If an organization is to remain a viable entity in a campus community in which new students enter on a regular basis, it must possess the means of communicating with these students. Moreover, the organization’s ability to participate in the intellectual give and take of campüs debate, and to pursue its stated purposes, is limited by denial of access to the customary media for communicating with the administration, faculty members, and other stu *720 dents. Such impediments cannot be viewed as insubstantial.” Id., at 181-182 (footnote omitted).
It is striking that all of these same burdens are now borne by CLS. CLS is prevented from using campus facilities— unless at some future time Hastings chooses to provide a timely response to a CLS request and allow the group, as a favor or perhaps in exchange for a fee, to set up a table on the patio or to use a room that would otherwise be unoccupied. And CLS, like the SDS in Healy, has been cut off from “the customary media for communicating with the administration, faculty members, and other students.” Id., at 181-182.
It is also telling that the Healy Court, unlike today’s majority, refused to defer to the college president’s judgment regarding the compatibility of “sound educational policy” and free speech rights. The same deference arguments that the majority now accepts were made in defense of the college president’s decision to deny recognition in Healy. Respondents in that case emphasized that the college president, not the courts, had the responsibility of administering the institution and that the courts should allow him “ Vide discretion ... in determining what actions are most compatible with its educational objectives.’ ” Brief for Respondents in Healy v. James, O. T. 1971, No. 71-452, pp. 7-8. A supporting amicus contended that college officials “must be allowed a very broad discretion in formulating and implementing policies.” Brief for Board of Trustees, California State Colleges 6. Another argued that universities should be permitted to impose restrictions on speech that would not be tolerated elsewhere. Brief for American Association of Presidents of Independent Colleges and Universities 11-12.
The Healy Court would have none of this. Unlike the Court today, the Healy Court emphatically rejected the proposition that “First Amendment protections should apply with less force on college campuses than in the community at large.” 408 U. S., at 180. And on one key question after *721 another — whether the local SDS chapter was independent of the national organization, whether the group posed a substantial threat of material disruption, and whether the students’ responses to the committee’s questions about violence and disruption signified a willingness to engage in such activities — the Court drew its own conclusions, which differed from the college president’s.
The Healy Court was true to the principle that when it comes to the interpretation and application of the right to free speech, we exercise our own independent judgment. We do not defer to Congress on such matters, see Sable Communications of Cal., Inc. v. FCC, 492 U. S. 115, 129 (1989), and there is no reason why we should bow to university administrators.
In the end, I see only two possible distinctions between Healy and the present case. The first is that Healy did not involve any funding, but as I have noted, funding plays only a small part in this case. And if Healy would otherwise prevent Hastings from refusing to register CLS, I see no good reason why the potential availability of funding should enable Hastings to deny all of the other rights that go with registration.
This leaves just one way of distinguishing Healy: the identity of the student group. In Healy, the Court warned that the college president’s views regarding the philosophy of the SDS could not “justify the denial of First Amendment rights.” 408 U. S., at 187. Here, too, disapproval of CLS cannot justify Hastings’ actions.[2]
*722 III
The Court pays little attention to Healy and instead focuses solely on the question whether Hastings’ registration policy represents a permissible regulation in a limited public forum. While I think that Healy is largely controlling, I am content to address the constitutionality of Hastings’ actions under our limited public forum cases, which lead to exactly the same conclusion.
In this case, the forum consists of the RSO program. Once a public university opens a limited public forum, it “must respect the lawful boundaries it has itself set.” Rosenberger v. Rector and Visitors of Univ. of Va., 515 U. S. 819, 829 (1995). The university “may not exclude speech where its distinction is not ‘reasonable in light of the purpose served by the forum.’ ” Ibid, (quoting Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U. S. 788, 806 (1985)). And the university must maintain strict viewpoint neutrality. Board of Regents of Univ. of Wis. System v. Southworth, 529 U. S. 217, 234 (2000); Rosenberger, supra, at 829.
This requirement of viewpoint neutrality extends to the expression of religious viewpoints. In an unbroken line of decisions analyzing private religious speech in limited public forums, we have made it perfectly clear that “[r]eligion is [a] viewpoint from which ideas are conveyed.” Good News Club v. Milford Central School, 533 U. S. 98, 112, and n. 4 (2001). See Rosenberger, supra, at 831; Lamb’s Chapel v. Center Moriches Union Free School Dist., 508 U. S. 384, 393-394 (1993); Widmar v. Vincent, 454 U. S. 263, 277 (1981).
We have applied this analysis in cases in which student speech was restricted because of the speaker’s religious viewpoint, and we have consistently concluded that such restrictions constitute viewpoint discrimination. E. g., Rosenberger, supra, at 845-846; Widmar, supra, at 267, n. 5, 269, 277; see also Good News Club, supra, at 106-107, 109-110; *723 Lamb’s Chapel, supra, at 392-393, 394. We have also stressed that the rules applicable in a limited public forum are particularly important in the university setting, where “the State acts against a background of tradition of thought and experiment that is at the center of our intellectual and philosophic tradition.” Rosenberger, supra, at 835.
IV
Analyzed under this framework, Hastings’ refusal to register CLS pursuant to its Nondiscrimination Policy plainly fails.[3] As previously noted, when Hastings refused to register CLS, it claimed that the CLS bylaws impermissibly discriminated on the basis of religion and sexual orientation. *724 As interpreted by Hastings and applied to CLS, both of these grounds constituted viewpoint discrimination.
Religion. The First Amendment protects the right of “ ‘expressive association’ ” — that is, the “right to associate for the purpose of speaking.” Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U. S. 47, 68 (2006) (quoting Boy Scouts of America v. Dale, 530 U. S. 640, 644 (2000)). And the Court has recognized that “[t]he forced inclusion of an unwanted person in a group infringes the group’s freedom of expressive association if the presence of that person affects in a significant way the group’s ability to advocate public or private viewpoints.” Id., at 648.
With one important exception, the Hastings Nondiscrimination Policy respected that right. As Hastings stated in its answer, the Nondiscrimination Policy “permit[ted] political, social, and cultural student organizations to select officers and members who are dedicated to a particular set of ideals or beliefs.” App. 93. But the policy singled out one category of expressive associations for disfavored treatment: groups formed to express a religious message. Only religious groups were required to admit students who did not share their views. An environmentalist group was not required to admit students who rejected global warming. An animal rights group was not obligated to accept students who supported the use of animals to test cosmetics. But CLS was required to admit avowed atheists. This was patent viewpoint discrimination. “By the very terms of the [Nondiscrimination Policy], the University . . . selected] for disfavored treatment those student [groups] with religious ... viewpoints.” Rosenberger, supra, at 831. It is no wonder that the Court makes no attempt to defend the constitutionality of the Nondiscrimination Policy.
Unlike the Court, Justice Stevens attempts a defense, contending that the Nondiscrimination Policy is viewpoint *725 neutral. But his arguments are squarely contrary to established precedent.
Justice Stevens first argues that the Nondiscrimination Policy is viewpoint neutral because it “does not regulate expression or belief at all” but instead regulates conduct. See ante, at 699 (concurring opinion). This Court has held, however, that the particular conduct at issue here constitutes a form of expression that is protected by the First Amendment. It is now well established that the First Amendment shields the right of a group to engage in expressive association by limiting membership to persons whose admission does not significantly interfere with the group’s ability to convey its views. See Dale, supra, at 648; Roberts v. United States Jaycees, 468 U. S. 609, 628 (1984); see also New York State Club Assn., Inc. v. City of New York, 487 U. S. 1, 13 (1988) (acknowledging that an “association might be able to show that it is organized for specific expressive purposes and that it will not be able to advocate its desired viewpoints nearly as effectively if it cannot confine its membership to those who share the same sex, for example, or the same religion”); Widmar, 454 U. S., at 268-269 (“[T]he First Amendment rights of speech and association extend to the campuses of state universities”). Indeed, the opinion of the Court, which Justice Stevens joins, acknowledges this rule. See ante, at 680.
Justice Stevens also maintains that the Nondiscrimination Policy is viewpoint neutral because it prohibits all groups, both religious and secular, from engaging in religious speech. See ante, at 699-700. This argument is also contrary to established law. In Rosenberger, the dissent, which Justice Stevens joined, made exactly this argument. See 515 U. S., at 895-896 (opinion of Souter, J.). The Court disagreed, holding that a policy that treated secular speech more favorably than religious speech discriminated on the *726 basis of viewpoint.[4] Id., at 831. The Court reaffirmed this holding in Good News Club, 533 U. S., at 112, and n. 4.
Here, the Nondiscrimination Policy permitted membership requirements that expressed a secular viewpoint. See App. 93. (For example, the Hastings Democratic Caucus and the Hastings Republicans were allowed to exclude members who disagreed with their parties’ platforms.) But religious groups were not permitted to express a religious viewpoint by limiting membership to students who shared their religious viewpoints. Under established precedent, this was viewpoint discrimination.[5]
It bears emphasis that permitting religious groups to limit membership to those who share the groups’ beliefs would not have the effect of allowing other groups to discriminate on the basis of religion. It would not mean, for example, that fraternities or sororities could exclude students on that basis. As our cases have recognized, the right of expressive association permits a group to exclude an applicant for member *727 ship only if the admission of that person would “affee[t] in a significant way the group’s ability to advocate public or private viewpoints.” Dale, 530 U. S., at 648. Groups that do not engage in expressive association have no such right. Similarly, groups that are dedicated to expressing a viewpoint on a secular topic (for example, a political or ideological viewpoint) would have no basis for limiting membership based on religion because the presence of members with diverse religious beliefs would have no effect on the group’s ability to express its views. But for religious groups, the situation is very different. This point was put well by a coalition of Muslim, Christian, Jewish, and Sikh groups: “Of course there is a strong interest in prohibiting religious discrimination where religion is irrelevant. But it is fundamentally confused to apply a rule against religious discrimination to a religious association.” Brief for American Islamic Congress et al. as Amici Curiae 3.
Sexual orientation. The Hastings Nondiscrimination Policy, as interpreted by the law school, also discriminated on the basis of viewpoint regarding sexual morality. CLS has a particular viewpoint on this subject, namely, that sexual conduct outside marriage between a man and a woman is wrongful. Hastings would not allow CLS to express this viewpoint by limiting membership to persons willing to express a sincere agreement with CLS’s views. By contrast, nothing in the Nondiscrimination Policy prohibited a group from expressing a contrary viewpoint by limiting membership to persons willing to endorse that group’s beliefs. A Free Love Club could require members to affirm that they reject the traditional view of sexual morality to which CLS adheres. It is hard to see how this can be viewed as anything other than viewpoint discrimination.
V
Hastings’ current policy, as announced for the first time in the brief filed in this Court, fares no better than the policy that the law school invoked when CLS’s application was de *728 nied. According to Hastings’ brief, its new policy, contrary to the position taken by Hastings officials at an earlier point in this litigation, really does not require a student group to accept all comers. Now, Hastings explains, its policy allows “neutral and generally applicable membership requirements unrelated to 'status or beliefs.’ ” Brief for Respondent Hastings College of the Law 5. As examples of permissible membership requirements, Hastings mentions academic standing, writing ability, “dues, attendance, and even conduct requirements.” Ibid, (emphasis added).
It seems doubtful that Hastings’ new policy permits registered groups to condition membership eligibility on whatever “conduct requirements” they may wish to impose. If that is the school’s current policy, it is hard to see why CLS may not be registered, for what CLS demands is that members foreswear “unrepentant participation in or advocacy of a sexually immoral lifestyle.” App. 146. That should qualify as a conduct requirement.
If it does not, then what Hastings’ new policy must mean is that registered groups may impose some, but not all, conduct requirements. And if that is the case, it is incumbent on Hastings to explain which conduct requirements are acceptable, which are not, and why CLS’s requirement is not allowed. Hastings has made no effort to provide such an explanation.[6]
VI
I come now to the version of Hastings’ policy that the Court has chosen to address. This is not the policy that Hastings invoked when CLS was denied registration. Nor is it the policy that Hastings now proclaims — and presumably implements. It is a policy that, as far as the record *729 establishes, was in force only from the time when it was first disclosed by the former dean in July 2005 until Hastings filed its brief in this Court in March 2010. Why we should train our attention on this particular policy and not the other two is a puzzle. But in any event, it is clear that the accept-all-comers policy is not reasonable in light of the purpose of the RSO forum, and it is impossible to say on the present record that it is viewpoint neutral.
A
Once a state university opens a limited forum, it “must respect the lawful boundaries it has itself set.” Rosenberger, 515 U. S., at 829. Hastings’ regulations on the registration of student groups impose only two substantive limitations: A group seeking registration must have student members and must be noncommercial. App. to Pet. for Cert. 82a-83a, Hastings Board of Directors, Policies and Regulations Applying to College Activities, Organizations and Students §34.10 (June 22, 1990) (hereinafter Hastings Regulations). Access to the forum is not limited to groups devoted to particular purposes. The regulations provide that a group applying for registration must submit an official document including “a statement of its purpose,” id., at 83a (Hastings Regulations §34.10.A.l (emphasis added)), but the regulations make no attempt to define the limits of acceptable purposes. The regulations do not require a group seeking registration to show that it has a certain number of members or that its program is of interest to any particular number of Hastings students. Nor do the regulations require that a group serve a need not met by existing groups.
The regulations also make it clear that the registration program is not meant to stifle unpopular speech. They proclaim that “[i]t is the responsibility of the Dean to ensure an ongoing opportunity for the expression of a variety of viewpoints.” Id., at 82a (Hastings Regulations §33.11). *730 They also emphatically disclaim any endorsement of or responsibility for views that student groups may express. Id., at 85a (Hastings Regulations § 34.10.D).
Taken as a whole, the regulations plainly contemplate the creation of a forum within which Hastings students are free to form and obtain registration of essentially the same broad range of private groups that nonstudents may form off campus. That is precisely what the parties in this case stipulated: The RSO forum “seeks to promote a diversity of viewpoints among registered student organizations, including viewpoints on religion and human sexuality.” App. 216 (emphasis added).
The way in which the RSO forum actually developed corroborates this design. As noted, Hastings had more than 60 RSOs in 2004-2005, each with its own independently devised purpose. Some addressed serious social issues; others — for example, the wine appreciation and ultimate Frisbee clubs— were simply recreational. Some organizations focused on a subject but did not claim to promote a particular viewpoint on that subject (for example, the Association of Communications, Sports & Entertainment Law); others were defined, not by subject, but by viewpoint. The forum did not have a single Party Politics Club; rather, it featured both the Hastings Democratic Caucus and the Hastings Republicans. There was no Reproductive Issues Club; the forum included separate pro-choice and pro-life organizations. Students did not see fit to create a Monotheistic Religions Club, but they have formed the Hastings Jewish Law Students Association and the Hastings Association of Muslim Law Students. In short, the RSO forum, true to its design, has allowed Hastings students to replicate on campus a broad array of private, independent, noncommercial organizations that is very similar to those that nonstudents have formed in the outside world.
*731 The accept-all-comers policy is antithetical to the design of the RSO forum for the same reason that a state-imposed accept-all-comers policy would violate the First Amendment rights of private groups if applied off campus. As explained above, a group’s First Amendment right of expressive association is burdened by the “forced inclusion” of members whose presence would “affee[t] in a significant way the group’s ability to advocate public or private viewpoints.” Dale, 530 U. S., at 648. The Court has therefore held that the government may not compel a group that engages in “expressive association” to admit such a member unless the government has a compelling interest, “ 'unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.’” Ibid, (quoting Roberts, 468 U. S., at 623).
There can be no dispute that this standard would not permit a generally applicable law mandating that private religious groups admit members who do not share the groups’ beliefs. Religious groups like CLS obviously engage in expressive association, and no legitimate state interest could override the powerful effect that an accept-all-comers law would have on the ability of religious groups to express their views. The State of California surely could not demand that all Christian groups admit members who believe that Jesus was merely human. Jewish groups could not be required to admit anti-Semites and Holocaust deniers. Muslim groups could not be forced to admit persons who are viewed as slandering Islam.
While there can be no question that the State of California could not impose such restrictions on all religious groups in the State, the Court now holds that Hastings, a state institution, may impose these very same requirements on students who wish to participate in a forum that is designed to foster the expression of diverse viewpoints. The Court lists four justifications offered by Hastings in defense of the accept- *732 all-comers policy and, deferring to the school’s judgment, ante, at 687, the Court finds all those justifications satisfactory, ante, at 687-690. If we carry out our responsibility to exercise our own independent judgment, however, we must conclude that the justifications offered by Hastings and accepted by the Court are insufficient.
The Court first says that the accept-all-comers policy is reasonable because it helps Hastings to ensure that “ leadership, educational, and social opportunities’” are afforded to all students. Ante, at 688 (quoting Brief for Respondent Hastings College of the Law 32). The RSO forum, however, is designed to achieve these laudable ends in a very different way — by permitting groups of students, no matter how small, to form the groups they want. In this way, the forum multiplies the opportunity for students to serve in leadership positions; it allows students to decide which educational opportunities they wish to pursue through participation in extracurricular activities; and it permits them to create the “social opportunities” they desiré by forming whatever groups they wish to create.
Second, the Court approves the accept-all-comers policy because it is easier to enforce than the Nondiscrimination Policy that it replaced. It would be “a daunting labor,” the Court warns, for Hastings to try to determine whether a group excluded a member based on belief as opposed to status. Ante, at 688; see also ante, at 699, n. 1 (opinion of Stevens, J.) (referring to the “impossible task of separating out belief-based from status-based religious discrimination”).
This is a strange argument, since the Nondiscrimination Policy prohibits discrimination on substantially the same grounds as the antidiscrimination provisions of many States,[7] including California, and except for the inclusion of the prohibition of discrimination based on sexual orientation, the *733 Nondiscrimination Policy also largely tracks federal antidiscrimination laws.[8] Moreover, Hastings now willingly accepts greater burdens under its latest policy, which apparently requires the school to distinguish between certain “conduct requirements” that are allowed and others that are not. Nor is Hastings daunted by the labor of determining whether a club admissions exam legitimately tests knowledge or is a pretext for screening out students with disfavored beliefs. Asked at oral argument whether CLS could require applicants to pass a test on the Bible, Hastings’ attorney responded: “If it were truly an objective knowledge test, it would be okay.” Tr. of Oral Arg. 52. The long history of disputes about the meaning of Bible passages belies any suggestion that it would be an easy task to determine whether the grading of such a test was “objective.”
Third, the Court argues that the accept-all-comers policy, by bringing together students with diverse views, encourages tolerance, cooperation, learning, and the development of conflict-resolution skills. Ante, at 689. These are obviously commendable goals, but they are not undermined by permitting a religious group to restrict membership to persons who share the group’s faith. Many religious groups impose such restrictions. See, e. g., Brief for Agudath Israel of America as Amicus Curiae 3 (“[Biased upon millennia-old Jewish laws and traditions, Orthodox Jewish institutions .. . regularly differentiate between Jews and non-Jews”). Such *734 practices are not manifestations of “contempt” for members of other faiths. Cf. ante, at 703 (opinion of Stevens, J.) (invoking groups that have “contempt for Jews, blacks, and women”). Nor do they thwart the objectives that Hastings endorses. Our country as a whole, no less than the Hastings College of the Law, values tolerance, cooperation, learning, and the amicable resolution of conflicts. But we seek to achieve those goals through “[a] confident pluralism that conduces to civil peace and advances democratic consensus-building,” not by abridging First Amendment rights. Brief for Gays and Lesbians for Individual Liberty as Amicus Curiae 35.
Fourth, the Court observes that Hastings’ policy “incorporates — in fact, subsumes — state-law proscriptions on discrimination.” Ante, at 689. Because the First Amendment obviously takes precedence over any state law, this would not justify the Hastings policy even if it were true — but it is not. The only Hastings policy considered by the Court— the accept-all-comers policy — goes far beyond any California antidiscrimination law. Neither Hastings nor the Court claims that California law demands that state entities must accept all comers. Hastings itself certainly does not follow this policy in hiring or student admissions.
Nor is it at all clear that California law requires Hastings to deny registration to a religious group that limits membership to students who share the group’s religious beliefs. Hastings cites no California court decision or administrative authority addressing this question. Instead, Hastings points to a statute prohibiting discrimination on specified grounds, including religion or sexual orientation, “in any program or activity conducted by” certain postsecondary educational institutions. Cal. Educ. Code Ann. §66270 (West Supp. 2010) (emphasis added). Hastings, however, does not conduct the activities of the student groups it registers. Indeed, Hastings disclaims such responsibility, stating both in *735 its regulations and its Handbook for Student Organizations that it “does not sponsor student organizations and therefore does not accept liability for activities of student organizations.” App. to Pet. for Cert. 85a (Hastings Regulations § 34.10.D (emphasis added)); App. 250. In addition, as CLS notes, another provision of California law specifically exempts “any funds that are used directly or indirectly for the benefit of student organizations” from a ban on state funding of private groups that discriminate on any of the grounds listed in § 66270. See § 92150 (West Supp. 2010)..
The authority to decide whether § 66270 or any other provision of California law requires religious student groups at covered institutions to admit members who do not share the groups’ religious views is of course a question of state law that we cannot resolve. The materials that have been brought to our attention, however, provide little support for the majority’s suggested interpretation.
In sum, Hastings’ accept-all-comers policy is not reasonable in light of the stipulated purpose of the RSO forum: to promote a diversity of viewpoints “among” — not within— “registered student organizations.” App. 216 (emphasis added).[9]
B
The Court is also wrong in holding that the accept-all-comers policy is viewpoint neutral. The Court proclaims that it would be “hard to imagine a more viewpoint-neutral policy,” ante, at 694, but I would not be so quick to jump to this conclusion. Even if it is assumed that the policy is *736 viewpoint neutral on its face,[10] there is strong evidence in the record that the policy was announced as a pretext.
The adoption of a facially neutral policy for the purpose of suppressing the expression of a particular viewpoint is viewpoint discrimination. See Crawford v. Board of Ed. of Los Angeles, 458 U. S. 527, 544 (1982) (“[A] law neutral on its face still may be unconstitutional if motivated by a discriminatory purpose”). A simple example illustrates this obvious point. Suppose that a hated student group at a state university has never been able to attract more than 10 members. Suppose that the university administration, for the purpose of preventing that group from using the school grounds for meetings, adopts a new rule under which the use of its facilities is restricted to groups with more than 25 members. Al *737 though this rule would be neutral on its face, its adoption for a discriminatory reason would be illegal.
Here, CLS has made a strong showing that Hastings’ sudden adoption and selective application of its accept-all-comers policy was a pretext for the law school’s unlawful denial of CLS’s registration application under the Nondiscrimination Policy.
Shifting policies. When Hastings denied CLS’s application in the fall of 2004, the only policy mentioned was the Nondiscrimination Policy. In July 2005, the former dean suggested in a deposition that the law school actually followed the very different accept-all-comers policy. In March of this year, Hastings’ brief in this Court rolled out still a third policy. As is recognized in the employment discrimination context, where issues of pretext regularly arise, “[sjubstantial changes over time in [an] employer’s proffered reason for its employment decision support a finding of pretext.” Kobrin v. University of Minnesota, 34 F. 3d 698, 703 (CA8 1994); see also, e. g., Aragon v. Republic Silver State Disposal Inc., 292 F. 3d 654, 661 (CA9 2002); Cicero v. Borg-Warner Automotive, Inc., 280 F. 3d 579, 592 (CA6 2001).
Timing. The timing of Hastings’ revelation of its new policies closely tracks the law school’s litigation posture. When Hastings denied CLS registration, it cited only the Nondiscrimination Policy. Later, after CLS alleged that the Nondiscrimination Policy discriminated against religious groups, Hastings unveiled its accept-all-comers policy. Then, after we granted certiorari and CLS’s opening brief challenged the constitutionality — and the plausibility — of the accept-all-comers policy, Hastings disclosed a new policy. As is true in the employment context, “[w]hen the justification for an adverse . . . action changes during litigation, that inconsistency raises an issue whether the proffered reason truly motivated the defendant’s decision.” Ibid.
Lack of documentation. When an employer has a written policy and then relies on a rule for which there is no written *738 documentation, that deviation may support an inference of pretext. See, e. g., Diaz v. Eagle Produce Ltd. Partnership, 521 F. 3d 1201, 1214 (CA9 2008); Budin v. Lincoln Land Community College, 420 F. 3d 712, 727 (CA7 2005); Machinchick v. PB Power, Inc., 398 F. 3d 345, 354, n. 29 (CA5 2005); Russell v. TG Missouri Corp., 340 F. 3d 735, 746 (CA8 2003); Mohammed v. Callaway, 698 F. 2d 395, 399-400, 401 (CA10 1983).
Here, Hastings claims that it has had an accept-all-comers policy since 1990, but it has not produced a single written document memorializing that policy. Nor has it cited a single occasion prior to the dean’s deposition when this putative policy was orally disclosed to either student groups interested in applying for registration or to the Office of Student Services, which was charged with reviewing the bylaws of applicant groups to ensure that they were in compliance with the law school’s policies.
Nonenforcement. Since it appears that no one was told about the accept-all-comers policy before July 2005, it is not surprising that the policy was not enforced. The record is replete with evidence that Hastings made no effort to enforce the all-comers policy until after it was proclaimed by the former dean. See, e. g., App. to Pet. for Cert. 118a (Hastings Democratic Caucus); id., at 110a (Association of Trial Lawyers of America at Hastings); id., at 146a-147a (Vietnamese American Law Society); id., at 142a-143a (Silenced Right); App. 192 (La Raza). See generally supra, at 712-713. If the record here is not sufficient to permit a finding of pretext, then the law of pretext is dead.
The Court — understandably—sidesteps this issue. The Court states that the lower courts did not address the “argument that Hastings selectively enforces its all-comer policy,”[11] that “this Court is not the proper forum to air the *739 issue in the first instance,” and that “[o]n remand, the Ninth Circuit may consider CLS’s pretext argument if, and to the extent, it is preserved.” Ante, at 697-698.
Because the Court affirms the entry of summary judgment in favor of respondents, it is not clear how CLS will be able to ask the Ninth Circuit on remand to review its claim of pretext. And the argument that we should not address this issue of pretext because the Ninth Circuit did not do so is hard to take, given that the Ninth Circuit barely addressed anything, disposing of this case in precisely two sentences.
Neither of those two sentences addressed the “novel question,” ante, at 668, to which the bulk of this Court’s opinion is devoted, i e., whether the accept-all-comers policy is reasonable in light of the purposes of the RSO forum and is viewpoint neutral, see ante, at 683-697. If it is appropriate for us to consider that issue, then the Ninth Circuit’s failure to address the issue of pretext should not stand in the way of review by this Court.
C
One final aspect of the Court’s decision warrants comment. In response to the argument that the accept-all-comers policy would permit a small and unpopular group to be taken over by students who wish to silence its message, the Court states that the policy would permit a registered group to impose membership requirements “designed to ensure that students join because of their commitment to a group’s vitality, not its demise.” Ante, at 693. With this concession, the Court tacitly recognizes that Hastings does not really have an accept-all-comers policy — it has an accept-some- *740 dissident-comers policy — and the line between members who merely seek to change a group’s message (who apparently must be admitted) and those who seek a group’s “demise” (who may be kept out) is hopelessly vague.
Here is an example. Not all Christian denominations agree with CLS’s views on sexual morality and other matters. During a recent year, CLS had seven members. Suppose that 10 students who are members of denominations that disagree with CLS decided that CLS was misrepresenting true Christian doctrine. Suppose that these students joined CLS, elected officers who shared their views, ended the group’s affiliation with the national organization, and changed the group’s message. The new leadership would likely proclaim that the group was “vital” but rectified, while CLS, I assume, would take the view that the old group had suffered its “demise.” Whether a change represents reform or transformation may depend very much on the eye of the beholder.
Justice Kennedy takes a similarly mistaken tack. He contends that CLS “would have a substantial case on the merits if it were shown that the all-comers policy was . . . used to infiltrate the group or challenge its leadership in order to stifle its views,” ante, at 706 (concurring opinion), but he does not explain on what ground such a claim could succeed. The Court holds that the accept-all-comers policy is viewpoint neutral and reasonable in light of the purposes of the RSO forum. How could those characteristics be altered by a change in the membership of one of the forum’s registered groups? No explanation is apparent.
In the end, the Court refuses to acknowledge the consequences of its holding. A true accept-all-comers policy permits small unpopular groups to be taken over by students who wish to change the views that the group expresses. Rules requiring that members attend meetings, pay dues, and behave politely, see ante, at 693, would not eliminate this threat.
*741 The possibility of such takeovers, however, is by no means the most important effect of the Court’s holding. There are religious groups that cannot in good conscience agree in their bylaws that they will admit persons who do not share their faith, and for these groups, the consequence of an accept-all-comers policy is marginalization. See Brief for Evangelical Scholars (Officers and 24 Former Presidents of the Evangelical Theological Society) et al. as Amici Curiae 19 (affirmance in this case “will allow every public college and university in the United States to exclude all evangelical Christian organizations”); Brief for Agudath Israel of America as Amicus Curiae 3, 8 (affirmance would “point a judicial dagger at the heart of the Orthodox Jewish community in the United States” and permit that community to be relegated to the status of “a second-class group”); Brief for Union of Orthodox Jewish Congregations of America as Amicus Curiae 3 (affirmance “could significantly affect the ability of [affiliated] student clubs and youth movements ... to prescribe requirements for their membership and leaders based on religious beliefs and commitments”). This is where the Court’s decision leads.
* * *
I do not think it is an exaggeration to say that today’s decision is a serious setback for freedom of expression in this country. Our First Amendment reflects a “profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.” New York Times Co. v. Sullivan, 376 U. S. 254, 270 (1964). Even if the United States is the only Nation that shares this commitment to the same extent, I would not change our law to conform to the international norm. I fear that the Court’s decision marks a turn in that direction. Even those who find CLS’s views objectionable should be concerned about the way the group has been treated — by Hastings, the Court of Appeals, and now this Court. I can only hope that this decision will turn out to be an aberration.

 CLS consistently argued in the courts below that Hastings had applied its registration policy in a discriminatory manner. See, e. g., Plaintiff’s Notice of Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment in No. C 04-4484-JSW (ND Cal.), pp. 6-7 (“Hastings allows other registered student organizations to require that their members and/or leaders agree with the organization’s beliefs and purposes”). CLS took pains to bring forward evidence to substantiate this claim. See swpra, at 712-713.
CLS’s brief in the Court of Appeals reiterated its contention that Hastings had not required all RSOs to admit all student applicants. CLS’s brief stated that “Hastings allows other registered student organizations to require that their leaders and/or members agree with the organization’s beliefs and purposes.” Brief for Appellant in No. 06-15956 (CA9), pp. 14-15 (citing examples). See also id., at 54-55 (“Hastings routinely recognizes student groups that limit membership or leadership on the *715 basis of belief.. . . Hastings’ actual practice demonstrates that the forum is not reserved to student organizations that do not discriminate on the basis of belief”). Responding to these arguments, the law school remarked that CLS “repeatedly asserts that ‘Hastings routinely recognizes student groups that limit membership or leadership on the basis of belief.’ ” Brief for Appellees in No. 06-15956 (CA9), p. 4.

 The Court attempts to distinguish Healy on the ground that there the college “explicitly denied the student group official recognition because of the group’s viewpoint.” Ante, at 684, n. 15. The same, however, is true here. CLS was denied recognition under the Nondiscrimination Policy because of the viewpoint that CLS sought to express through its membership requirements. See supra, at 710; infra, at 723-728. And there is strong evidence that Hastings abruptly shifted from the Nondiscrimination Policy to the accept-all-eomers policy as a pretext for viewpoint discrimination. See infra, at 737-739.

 CLS sought a declaratory judgment that this policy is unconstitutional and an injunction prohibiting its enforcement. See App. 80. Particularly in light of Hastings’ practice of changing its announced policies, these requests are not moot. It is well settled that the voluntary cessation of allegedly unlawful conduct does not moot a ease in which the legality of that conduct is challenged. See City of Mesquite v. Aladdin’s Castle, Inc., 455 U. S. 283, 289 (1982); see also Allee v. Medrano, 416 U. S. 802, 810-811 (1974); DeFunis v. Odegaard, 416 U. S. 312, 318 (1974) (per curiam). If the rule were otherwise, the courts would be compelled to leave “ ‘[t]he defendant... free to return to his old ways.’ ” United States v. Concentrated Phosphate Export Assn., Inc., 393 U. S. 199, 203 (1968) (quoting United States v. W. T. Grant Co., 345 U. S. 629, 632 (1953)). Here, there is certainly a risk that Hastings will “return to [its] old ways,” and therefore CLS’s requests for declaratory and injunctive relief with respect to the Nondiscrimination Policy are not moot. If, as the Court assumes, the parties stipulated that the only relevant policy is the aeeept-all-eomers policy, then the District Court should not have addressed the constitutionality of the Nondiscrimination Policy. But the District Court approved both policies, and the Court of Appeals affirmed the judgment. That judgment remains binding on CLS, so it is only appropriate that CLS be permitted to challenge that determination now. The question of the constitutionality of the Nondiscrimination Policy falls comfortably within the question presented, and CLS raised that issue in its brief. See Brief for Petitioner 41-46.

 In Rosenberger, the university argued that the denial of student activity funding for all groups that sought to express a religious viewpoint was “facially neutral.” See Brief for Respondents in Rosenberger v. Rector & Visitors of Univ. of Va., O. T. 1994, No. 94-329, p. 2; 515 U. S., at 824-825. The Rosenberger dissenters agreed that the university’s policy did not constitute viewpoint discrimination because “it applie[d] to Muslim and Jewish and Buddhist advocacy as well as to Christian,” and it “applie[d] to agnostics and atheists as well as it does to deists and theists.” Id., at 895-896 (opinion of Souter, J.); cf. ante, at 699-700 (opinion of Stevens, J.) (asserting that under Hastings’ Nondiscrimination Policy “all acts of religious discrimination” are prohibited (emphasis added)). But the Court flatly rejected this argument. See 515 U. S., at 831 (“Religion may be a vast area of inquiry, but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered”).

 It is not at all clear what Justice Stevens means when he refers to religious “status” as opposed to religious belief. See ante, at 699, n. 1. But if by religious status he means such things as the religion into which a person was born or the religion of a person’s ancestors, then prohibiting discrimination on such grounds would not involve viewpoint discrimination. Such immutable characteristics are quite different from viewpoint.

 Nor does the Court clarify this point. Suggesting that any conduct requirement must relate to “gross misconduct,” ante, at 671, n. 2, is not helpful.

 See, e. g., Cal. Govt. Code Ann. § 12940(a) (West 2005); N. J. Stat. Ann. § 10:5-12(a) (West 2002); N. Y. Exec. Law Ann. §296(1)(a) (West 2010).

 See, e. g., Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. §2000e et seq. (Title VII); id., at 252, as amended, 42 U. S. C. §2000d et seq. (Title VI); Age Discrimination in Employment Act of 1967, 81 Stat. 602, as amended, 29 U. S. C. § 621 et seq.; Americans with Disabilities Act of 1990, 104 Stat. 337, 42 U. S. C. § 12101 et seq. However, Title VII, which prohibits employment discrimination on the basis of religion, provides that religious associations and schools can hire on the basis of religion and that any employer can hire on the basis of religion if it is a bona fide occupational qualification. 42 U. S. C. §§2000e-1(a), 2000e-2(e).

 Although we have held that the sponsor of a limited public forum “must respect the lawful boundaries it has itself set,” Rosenberger, 515 U. S., at 829, the Court now says that, if the exclusion of a group is challenged, the sponsor can retroactively redraw the boundary lines in order to justify the exclusion. See ante, at 687-688, n. 17. This approach does not respect our prior holding.

 In Board of Regents of Univ. of Wis. System v. Southworth, 529 U. S. 217 (2000), the Court considered a university rule permitting the “defundling]” of a registered student group through a student referendum. See id., at 224-225. “To the extent the referendum substitutes majority determinations for viewpoint neutrality,” the Court observed, “it would undermine the constitutional protection the [university’s registered student organization] program requires.” Id., at 235. “The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views.” Ibid.
Hastings’ accept-all-comers policy bears a resemblance to the South-worth referendum process. Both permit the majority to silence a disfavored organization. There is force to CLS’s argument that “[a]llowing all students to join and lead any group, even when they disagree with it, is tantamount to establishing a majoritarian heckler’s veto” and “potentially turn[s] every group into an organ for the already-dominant opinion.” Brief for Petitioner 51.
The Court attempts to distinguish Southworth as involving a funding mechanism for student groups that operated selectively, based on groups’ viewpoints. Ante, at 695, n. 25. But that mechanism — a student referendum process — placed all students at risk of “being required to pay fees which are subsidies for speech they find objectionable, even offensive," solely upon a majority vote of the student body. See 529 U. S., at 230, 235. That is no different in principle than an accept-all-comers policy that places all student organizations at risk of takeover by a majority that is hostile to a group’s viewpoint.

 As previously noted, CLS consistently argued in the courts below that Hastings had applied its registration policy in a discriminatory manner. See supra, at 714-715, n. 1. The Court would ignore these arguments be *739 cause counsel for CLS acknowledged below that Hastings has an all-comers policy. See ante, at 675-676, n. 5 (quoting examples). But as the Court itself acknowledges, counsel for CLS stated at oral argument in this Court that “the Court needs to reach the constitutionality of the all-comers policy as applied to CLS in this case. ” Tr. of Oral Arg. 59 (emphasis added); ante, at 676, n. 5. And as the record shows, CLS has never ceded its argument that Hastings applies its accept-all-comers policy unequally.